JAMES R. HAYNES. SR., v. FELDSPAR PRODUCING COMPANY, EMPLOYER. AND BITUMINOUS CASUALTY CORPORATION, CARRIER.

(Filed 21 October, 1942.)

**1. Master and Servant § 55d—**

Findings of fact by the Industrial Commission, when supported by competent evidence, are conclusive on appeal.

**2. Master and Servant § 40b—**

In a proceeding to recover compensation, under occupational disease sections of the Workmen's Compensation Act, alleging that plaintiff was afflicted with silicosis, there was evidence that plaintiff had worked in

feldspar mines for twenty years and had contracted silicosis before his last employment, which was as a mucker in defendant's mine from 24 September, 1940, to 24 January, 1941, it being an open pit mine using a drill twice a week, and tests showing that plaintiff was exposed to several times more dust particles per cubic foot than the maximum for the limit of safety, and an examination on 28 November, 1940, showing that plaintiff had moderately advanced silicosis with probable infection and was unable to perform normal labor as a mucker, both at that time and since. *Held:* (1) Testimony of a medical expert, in answer to a hypothetical question, fairly stating the essential facts, competent to show plaintiff injuriously exposed to the hazard of silicosis; and (2) the evidence generally sufficient to show injurious exposure and to sustain the award. C. S., 8081 (6).

BARNHILL, J., concurs in result.

APPEAL from *Johnston, Special Judge,* at March-April Term, 1942, of MITCHELL. Affirmed.

The plaintiff brought this proceeding to recover compensation under the occupational disease sections of the Workmen's Compensation Act, complaining that he was afflicted with silicosis and was last injuriously exposed to the hazards of such disease while employed by the defendant company. From the award made by the 'Industrial Commission, the defendants appealed; and at the hearing in the Superior Court, the award was affirmed and from this judgment defendants appealed to this Court.

The controversy here concerns the sufficiency of the evidence to support the findings of fact by the Commission that plaintiff was last injuriously exposed to the disease while working in the employment of defendant in its feldspar mine in Mitchell County.

The evidence discloses that the plaintiff had been working in feldspar mines in North Carolina for about twenty-eight years. From 1927 to 1940, he worked for the Tennessee Mineral Corporation at its English Knob Mine, which was an underground and closed mine, in which there was flint and dust.

At this mine the plaintiff did some drilling and worked close to the drillers. The "silica dust" in that mine was pretty bad, and plaintiff was exposed to it constantly. The method of dry drilling was used in the mine.

The plaintiff began working for the Producing Company at its Hoot Owl Mine in Mitchell County 24 September, 1940, working there as a mucker. As mucker his duties required him to shovel up feldspar and put it in the cars.

The Hoot Owl Mine was an open mine, using only one drill, and using this two days a week. Plaintiff worked in positions from five to thirty feet from where the drill was used on the days it was working. There

HAYNES *v.* FELDSPAR PRODUCING CO.

was dust there during the time the defendant was drilling, and on other days, about 10% of the time the dust would blow down from the banks and earth's surface. The dust came from feldspar and flint in that mine.

On 24 January, 1941, plaintiff received a letter from Dr. Vestal informing him that he had silicosis, and plaintiff worked no more after that date. The letter is as follows:

"NORTH CAROLINA
STATE BOARD OF HEALTH
RALEIGH

January 21, 1941

"MR. JAMES R. HAYNES, SR.,
Spruce Pine, N. C.

"DEAR MR. HAYNES: Reference is made to our examination of you at Spruce Pine on November 28th. Your history reveals a cough of seven years duration, dry in type and worse at night. Moderate shortness of breath which is not progressive is admitted over a period of three years. Your physical examination reveals little of importance, however, your x-ray reveals rather widespread disease distributed throughout both lungs which we believe to be due to your previous dust exposure. We believe that this places you in a classification of moderately advanced silicosis with probable infection. The infection may be of a tuberculous nature but this, of course, can only be determined by further study of your case, which should be done at a sanatorium.

"We are, of course, unable to issue to you a work card necessary for employees engaged in a dusty trade.

Yours very truly,
Signed: T. F. VESTAL, M.D.,
Director Division of
Industrial Hygiene.

"TFV : vh.
Cc : N. C. Industrial Commission.
Feldspar Producing Company."

Since that time plaintiff has been short-winded, his heart has beat fast, and he has coughed. He has done no work except in his vegetable garden at home.

Plaintiff testified that when he worked for the Tennessee Mineral Corporation, he was short-winded, too, and his heart beat fast, and his chest hurt him sometimes then. He had been coughing and short-winded for seven years, and during that time his heart had been beating fast.

M. F. Trice, engineer for the Division of Industrial Hygiene, a joint activity of the Industrial Commission and the State Board of Health, specializing in dust counts and occupational environments as they relate to occupational diseases, examined the Hoot Owl Mine of the defendant in the fall of 1936, and also on the day of his testimony. He testified that there had been no material changes in the mine since his examination in 1936. At that time he took specimens. The first sample represented dry drilling near the open wall of the open cut and the particle count on that sample indicated a dust concentration of 66½ millions per cubic foot of air. Another sample was taken 20 to 25 feet away from the driller and represented mucking. This indicated a dust count of 44.8 million particles per cubic foot of air. Then another sample was taken to represent exposure and dry drilling and on this test, the concentration was 271 million particles per cubic foot of air. Another sample was taken to evaluate the mucking operation 20 feet away from the driller, and the particle counts on that sample of dust indicated a concentration of 30.2 million particles per cubic foot. In the opinion of the witness, the dust concentration in this mine is sufficient to constitute a silicosis hazard.

"When there was drilling going on in the defendant's mine, the dust count would naturally be larger than it would be when there was no drilling going on. If drilling was done there today, for all practical purposes, the dust would be gone by tonight. The counts in 1936 were made while the drilling was being done at this mine, as we always want to get the worst possible condition. The United States Public Health Service found that anything less than 10 million particles of dust per cubic foot of air was all right. However, once you pass that point, whenever a man is exposed to concentrations of dust in excess of that, there is likelihood of some ill-effects. This is based on a constant concentration, year in and year out. Two drills make more dust than one drill. The man drilling is exposed to more dust than the man who is mucking. The closer the man is to the drill, the more apt he is to breathe some of the dust. The defendant's open mine is about 60 feet deep. There would not be much dust count growing out of mucking. When the wind was blowing, I should think that any dust in the mine would be picked up and carried away with the wind."

Dr. T. F. Vestal was examined for the plaintiff. When this witness was presented, it was explained to him that the expression "last injuriously exposed" as used in the statute, N. C. Code (Michie), sec. 8081 (6), meant an exposure which proximately augmented the disease to any extent, however slight. A hypothetical question was addressed to him, based on the evidence before the Commission, and he was asked to give an opinion as to whether or not under the conditions named and the

facts presented in the hypothetical question, the exposure to which the employee was subjected from 24 September, 1940, to 24 January, 1941, while working for the defendant employer, constituted an injurious exposure, or whether or not as a result of the exposure to said hazard, he was injuriously exposed to the hazard of the occupational disease of silicosis. The doctor replied: "You haven't left me much leeway. I have an opinion that it did constitute an injurious exposure."

The doctor further testified as follows:

"I examined the plaintiff on October 12, 1936, on November 8, 1937, on June 7, 1938, on October 24, 1938, and on November 28, 1940. In 1936, we found his condition negative. On November 8, 1937, we found that he had early silicosis, commonly referred to as silicosis one, without symptoms, and healed pulmonary tuberculosis. On October 25, 1938, I examined him and found that he had silicosis one. On November 28, 1940, I examined him and found that he had moderately advanced silicosis with probable infection. I have not seen the plaintiff from November 28, 1940, until today.

"I did not issue him a work card after the examination of November 28, 1940. This is the examination referred to in my letter to the plaintiff dated January 21, 1941 (heretofore introduced by the plaintiff and hereinabove set forth). In my opinion, the plaintiff is disabled to perform normal labor as a mucker and that he has been since the date of my report. During the four months while the plaintiff worked for the defendant employer, there were, as I understand, about 32 days on which the drill was operated there in the mine. If there had not been any dust on the other days, I don't think that this would amount to an injurious exposure. I can't state whether or not the plaintiff's silicosis advanced any at all between the time that he entered the defendant's employment and the time that he left it. I made no examination between October 25, 1938, and November 28, 1940, and it is entirely possible that the condition that I found on November 28, 1940, was existing on September 24, 1940. With the evidence and the knowledge that I have available to my mind, I can't say that he is so much as one degree worse off than he was on September 24, 1940.. I don't think there are any cases of silicosis on record where the disease has developed in less than a year.

"I heard the plaintiff testify that he worked for the Tennessee Mineral Corporation and its predecessor up there at that mine for something more than 20 years. I know that he has had silicosis since 1936. There are cases on record in which the actual development of the disease has occurred after the individual has been removed from the exposure. I think that it is a reasonable assumption to say that if he is exposed five days a week, he would be more apt to be damaged than he would be

if he were exposed only two days a week, and that if he is exposed eight hours a day, he would be more apt to be injured than he would be if he were exposed only two hours a day over a period of time.

"An open-air mine or cut would have less potential hazardous dust than a closed, underground mine. If the ground in the mine is moist, the dust would be less likely to blow up and recirculate. As far as the plaintiff is concerned, I can't say that he is a bit worse off, not even 1% worse off, than he was on September 24, 1940. I can't say that he is 1% worse off or 1% better off."

Defendant introduced evidence to the effect that only one drill was employed in the mine, which was an open mine; that the bottom of the mine during the four months period was wet practically all the time, that it had rained a great deal, that the sides of the mine dripped and leaked through from the right side; that plaintiff was a mucker and did no drilling; that the drill was not used more than twice a week, and some weeks did not average that much; that plaintiff was generally at least twenty feet away from the place where the other man was using the drill; that the wind generally came from the east end of the mine and plaintiff generally worked in the middle of the mine, and that the drill was at the other end of the mine, so that the wind blew past the plaintiff toward the drill.

There was further testimony that after the receipt of the letter from Dr. Vestal plaintiff was discharged from employment; that from the "standpoint of the layman," plaintiff did not look any worse off the day he was discharged than the day he came to work. That except on occasional days, which were not more than twice a week, when the one drill was used, there was no dust in the mine except maybe the dirt that would be blown from the surface of the earth across the cut or mine—just normal dust like you would see out on any road.

There was further testimony from the defendant substantially to the same effect.

The defendants contend that there was no evidence to support the award.

*Watson & Fouts for plaintiff, appellee.*
*Guthrie, Pierce & Blakeney for defendants, appellants.*

SEAWELL, J. The appeal presents the single question whether there is any evidence to support the finding of the Commission that the plaintiff was injuriously exposed to conditions augmenting his already contracted silicosis while in the employment of the defendant company. It is elementary that we are bound by the findings of fact of the Industrial Commission when they are supported by competent evidence, both

under the statute itself and by the custom of the Court. We refrain from multiplying citations of authority. It is also equally well established that the evidence should be considered in the light most favorable to the plaintiff, and that he is entitled to the benefit of every reasonable inference therefrom.

If the hypothetical question addressed to Dr. Vestal by Mr. Kimzey, examining member of the Commission, fairly represents the facts of the evidence—and we think it does—the affirmative answer of this medical expert must be accepted as competent evidence in support of the finding of the Commission. It is true that the witness was apparently dissatisfied with the form of the question—a feeling which seemed to be prompted by the thought that any advance in plaintiff's disease during the comparatively short period of his employment by defendant might be regarded as negligible. Obviously, the witness could not be permitted to put his own construction on the law; and we think the definition supplied by the Commission was substantially correct.

But outside of this opinion evidence, we find testimony of facts from which reasonable inferences may be drawn amounting to legal evidence; how strong is not for us to say.

Dr. Vestal had examined the plaintiff on 12 October, 1936, 8 November, 1937, 7 June, 1938, 24 October, 1938, and 28 November, 1940. On the first examination, plaintiff's condition was negative; in 1937, he had early silicosis, commonly referred to as "silicosis one," without symptoms, and healed pulmonary tuberculosis; in 1938, his condition was still "silicosis one"; on 28 November, 1940, he had advanced silicosis with probable infection. This is the examination referred to in Dr. Vestal's letter of 21 January, 1941, and no examination had been made meantime.

Upon the last examination made after the plaintiff had been working in the defendant's mine for a period of two months, there was a remarkable advance in the disease over the condition existing at the previous examination. The plaintiff worked in defendant's mine from 24 September, 1940, to 24 January, 1941, a period of four months. The same causes which originally gave rise to the silicosis were present in defendant's mine in a very pronounced order. While the evidence shows that the maximum limit of safety is 10 million dust particles in a cubic foot of air, the plaintiff worked near the drill where there were 271 million dust particles per cubic foot of air, from there all the way to twenty feet from the drill where there were 30.2 million particles per cubic foot of air. Huge quantities of this flint-laden air must have been inhaled hourly. The same reasoning which would attribute a major portion of the plaintiff's much advanced condition of silicosis to his previous exposure in the Tennessee mines would refer at least a minor part of it to his exposure in defendant's mine. Otherwise, the Commission would

have been forced to accept the view that at the time the plaintiff entered the service of the defendant company, his disease had reached the point of saturation—that there was no longer any sound tissue in the lungs to be scarred by the cutting particles of flint and reduced to a fibroid state. But although his breath was short and his heart beat faster in an effort to oxygenate the blood through the narrowing lung area which still retained its function, we must assume, because he still lived and breathed, he was capable of further injury.

Perhaps on a comparative basis, the chief responsibility for plaintiff's condition morally rests upon his Tennessee employers; but not the legal liability. It must have been fully understood by those who wrote the law fixing the responsibility on the employer in whose service the last injurious exposure took place, that situations like this must inevitably arise, but the law makes no provision for a partnership in responsibility, has nothing to say as to the length of the later employment or the degree of injury which the deleterious exposure must inflict to merit compensation. It takes the breakdown practically where it occurs—with the last injurious exposure.

Whether this properly distributes the burden of compensation over the industry is not for us to say. The law in its present form appears in the statutes of many states. If experience should require revision, it must be at the hands of the Legislature. It is to be noted that the prospective employer can avoid liability, if he so desires, by insisting that the candidate for employment be examined, and a prompt report made, before he is received into the service.

A careful review leads us to the conclusion that the judgment of the court sustaining the award should be

Affirmed.

BARNHILL, J., concurs in result.