Mildred OLSON, Appellant (Claimant below),

v.

FEDERAL AMERICAN PARTNERS, Appellee (Employer below).

No. 4777.

Supreme Court of Wyoming.

Aug. 2, 1977.

Thomas T. Zollinger, Rock Springs, signed the brief and appeared in oral argument on behalf of appellant.

Donald P. White, White, Avery & Vincent, Riverton, signed the brief and appeared in oral argument on behalf of appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

From a judgment of the district court denying claimant-appellant's claims for herself as the widow and on behalf of the dependent child of an employee covered by Wyoming's Occupational Disease Law, § 27–288, et seq., as amended, (repealed, § 4, Ch. 149, S.L.Wyo. 1975), arising out of the death of her husband, allegedly by malignancy caused by radiation, she appeals. We will affirm.

Section 27–290, of the Occupational Disease Law, stated in pertinent part:

"(a) The list of authorized compensable occupational diseases shall include:

\*     \*     \*     \*     \*     \*

"(xxii) ionizing radiation, radiation poisoning or malignancy caused thereby.
\*   \*   \*  "

Section 27–293 provided:

"When an employee has suffered a compensable occupational disease covered by this act, the employer's account in whose employment said employee was last injuriously exposed to the hazards of the disease at the time of exposure shall alone be liable therefore, without right to contribution from any prior employer."

Section 27–297(a) covered burden of proof:

"The burden in contested cases shall be upon the employee to make proper proof of his claim by a preponderance of the evidence, and to likewise prove by competent medical authority that this claim arose out of and in the course of his employment by showing by a preponderance of such evidence that:

"(i) there is a direct causal connection between the condition under which the work is performed and the occupational disease,

"(ii) the disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,

"(iii) the disease can be fairly traced to the employment as the proximate cause,

"(iv) the disease does not come from a hazard to which workmen would have been equally exposed outside of the employment,

"(v) and the disease is incidental to the character of the business and not independent of the relation of employer and employee."

The claimant's husband had been employed as an underground uranium miner, as follows:

| | |
|---|---|
| Jan. 8, 1958–Feb. 27, 1970 | Continental Uranium Co. |
| Mar. 4, 1970–Sept. 10, 1970 | Federal American Partners |
| Oct. 11, 1970–Jan. 15, 1971 | Continental Uranium Co. |
| Jan. 18, 1971–Dec. 29, 1971 | Federal American Partners |

The appellee-employer was Olson's last employer. While in that employment, he became ill and on May 23, 1973, died of lung cancer. The claimant at the trial asserted that her husband died of a lung cancer induced by occupational radiation exposure arising out of his last employment. The last employer denied liability, claiming that

Olson had not been subjected to injurious radiation exposure during his employment by it, so there was no causal connection between the employment with it and the lung cancer and, additionally, that there was no certainty that his cancer developed in his employment as a uranium miner. It was admitted that the deceased was an habitual cigarette smoker, having smoked daily at least a package to a package and a half from 1949 until 1971. The record evidence indicates he may have smoked even more.

The court's findings were:

"1. That it is unable to find that the Claimant has established by competent medical authority by a preponderance of the evidence that the disease of the decedent, Ralph R. Olson, did not come from a hazard to which the workman would have been equally exposed outside of his employment.

"2. That it is unable to find on the evidence in this case that the Claimant has established by the prescribed burden of proof that the disease in this case is not independent of the relation of Employer and employee.

"3. That it is unable to find that the Claimant has established that the disease is not independent of the relation of this particular Employer and this particular employee involved in these proceedings.

"4. That it is unable to find from the evidence that this Employer is the one in which the last injurious exposure occurred, neither is it able to make a contrary finding, and so that portion of the resolution of this case against the Claimant is made on the failure of the Claimant to carry the burden of proof prescribed by statute."

We see the only issue to be whether the trial judge erred in holding that the claimant failed in her statutory burden of proof.

Since the case is fact-oriented for disposition, the case has been predominantly studied and decided, having in mind the appellate rule that we will examine the evidence in the light most favorable to the prevailing party. *P & M Cattle Company v. Holler,* Wyo.1977, 559 P.2d 1019. Strangely enough here, the evidence most persuasive in support of the trial court's position came from the claimant's own expert witness. The employer's expert witness, a medical doctor, with a considerable experience in the study and treatment of cancer in uranium miners, was not in substantial disagreement. The record discloses that the trial judge was tempted to allow the employer's motion to dismiss at the close of claimant's presentation in chief, but wisely determined to hear the evidence of the employer, in order that there be a complete record of all evidence on both sides and avoid a remand because of the risk involved in an improvident early dismissal and piecemeal trial. Furthermore, as noted by the district court, the statute invoked considerations upon which this court has not previously ruled in its technical aspects, peculiar to uranium mining.

■ There is some similarity between Workmen's Compensation cases [1] and this one under the since repealed Occupational Disease Law but the former type case does not have the specially applicable statutory sections we must here take into account. This court has considered, however, a similar case of failure of proof under the Occupational Disease Law but involving a different lung ailment. *Hammond v. Hitching Post Inn,* Wyo.1974, 523 P.2d 482. The claimant must conform to the burden imposed.

Dr. Victor E. Archer, a nationally recognized expert in the field of cancer induced by radiation, associated with the mining of uranium, testified for the claimant. He was commendably frank in his appraisal of the dead miner's disease and its connotations.

1. See *Plummer v. Gladstone Hotel,* 1958, 78 Wyo. 427, 328 P.2d 1118, where the appeal of a denied Workmen's Compensation claim was based on an asserted erroneous determination of facts. Our duty in such cases is simply to search the record to ascertain the presence or absence of substantial evidence to support the district court.

It was Dr. Archer's testimony that there is a high incidence of lung cancer amongst uranium miners. In order to determine the amount of radiation to which decedent had been exposed in his lifetime, his body was disinterred and parts, particularly bones, removed for testing. The results of inhaling air laden with an inert gas, radon, a decay product of radiation, ends up as a further radiation decay product in the bones of a human being as lead-210. The amount of that end product in the bones can be measured and with adjustments for periods of nonexposure or noninjurious exposure will reveal with accuracy the amount of radon gas taken into the lungs during a lifetime of uranium mining.

As previously indicated, Olson had been employed by Continental Uranium Company upon his entry into his occupation as a miner in 1958 and worked for that company continuously until 1970, a period of about 12 years. He was with his last employer here intermittently for a total period of about 18 months. Clinical appearance of the cancer developed after 13 years of uranium mining. There is what is known as an induction-latent period, a length of time between when a man first starts uranium mining, and the advent of cancer. This period is usually around 15 years though the cancer may appear at any time after five years, here 13 years.

According to Dr. Archer, tobacco use to the extent engaged in by Olson can either be the cause of the cancer here involved or it may promote the development of cancer induced by radiation. The latter is referred to as a synergizing effect. Tobacco use also leaves lead-210 in the body. Dr. Archer explained that the incidence of lung cancer amongst uranium miners is greater to a definite extent among smoking miners than nonsmoking miners.

While the trial judge may have been able, at the most, to find that the cancer of which decedent died *might* have been induced by radiation from uranium mining in the first employer, the proof completely breaks down as far as "injurious exposure" with the last employer, with whom we are concerned, is involved. There was no proof that the working level of radiation in the Federal American Partners mine was not within practical prescribed limits of safety.[2] The evidence in that regard fails also to show that Olson was even working in areas of the mine where radiation at any level was present. There was no proof that Olson was "injuriously exposed" to the hazards of radiation-induced cancer with the employer here.

■ The clincher, however, was when the following question and answer by Dr. Archer went into the record:

"Q. Can you tell from your records with medical certainty that the death of Mr. Olson occurred or was caused solely by radiation exposure?

"A. No. I don't think we could be that certain about it."[3]

Dr. Archer specifically testified that if the working level exposure of Olson was within the United States Government permissible limits, there would not be injurious exposure; it would not contribute to or promote a cancer induced several years earlier with a different company but not discovered until later. The proof of the employer was that the exposure was within the safe lim-

2. The standard of measurement is "Working Level Months" (abbreviated "WLM"), a term incorporating a particular fixed quantity of radiation exposure over a work period of one month. The federal government standard of maximum exposure at the time in issue was four "Working Level Months" per year. The only acceptable proof of exposure with the employer party here was a total of around three WLM (.76 in 1970 and 2.31 in 1971) over a period of 18 months, not regarded an injurious exposure. The government-established standard, if followed during a working life as a uranium miner, would not induce cancer by radiation.

3. There must be a direct causal connection between the causal conditions under which the work is performed and the occupational disease. Section 27–297(a)(i). While statistically the risk of a uranium miner is increased, that does not rise to the standard of reasonable medical certainty to establish causal connection. *O'Connor v. Industrial Commission,* 1973, 19 Ariz.App. 43, 504 P.2d 966.

**714**

its. The claimant furnished no acceptable proof to the contrary.

■ If there is any reasonable basis for the findings of the trial judge as the fact finder, we must affirm. The outline we have just undertaken demonstrates the correctness of the district court and we likewise, as did the district court, hold there to have been a failure of proof under the applicable statutes, §§ 27–293 and 27–297, then in effect. For a similar case, see *Garner v. Hecla Mining Company*, 1967, 19 Utah 2d 367, 431 P.2d 794. For a case where there was a proven injurious exposure for a short period, see *Climax Uranium Company v. Smith's Claimant*, 1974, 33 Colo.App. 337, 522 P.2d 134.

■ We have considered that in the usual Workmen's Compensation case, the law should be liberally construed in favor of an award. However, such a policy does not give us carte blanche authority to ignore clear statutory provisions and under the guise of construction extend the beneficent purpose of the law to a disease or injury that does not fall reasonably within the reach of legislative language. *Pease v. Pacific Power & Light Company*, Wyo.1969, 453 P.2d 887, 888; *In re Hardison*, Wyo. 1967, 429 P.2d 320, 322. As said in the latter case, the rule of liberality is not to be

related to the evidence offered. 429 P.2d at 322. It is the burden of the employee to show the actual time of disability and cause under the statute then in effect. *Bemis v. Texaco, Inc.*, Wyo.1965, 400 P.2d 529, *reh. den.*, 401 P.2d 708. In this burden, the claimant has failed.

We need not consider the pertinence of the statute of limitations, § 27–308, an issue raised by the employer, making the Occupational Disease Law inapplicable when the last injurious exposure occurred before its effective date.

Affirmed.

ROSE, Justice, dissenting.

The principles underlying our Worker's Compensation Act are equally applicable to cases arising under the Occupational Disease Law.[1] In fact, historically, diseases tending to be occupational in nature, or at least contracted during the course of employment were handled under the Workmen's Compensation Law. See *In re Pero*, 49 Wyo. 131, 52 P.2d 690; and *Wright v. Wyoming State Training School*, 71 Wyo. 173, 255 P.2d 211. I notice also that with the repeal of the Occupational Disease Law, this will be the way this type of case is treated in the future.[2] With the coming of

---

1. The Occupational Disease Law was repealed by Session Laws of Wyoming, 1975, Chapter 149. This law was § 27–288 through § 27–309, W.S.1957, C.1967, 1973 Cum.Supp. [Session Laws of Wyoming, 1969, Chapter 200, Section 1 through Section 33] In referring to specific sections of this Act, I will refer to the sections both as they appeared in the Wyoming Statutes and the Session Laws of Wyoming.

2. See § 27–311(n), W.S.1957, C.1967, 1975 Cum.Supp., where "injury" is defined for the purpose of the Wyoming Worker's Compensation Act as:

". . . any harmful change in the human organism other than normal aging, and includes damage to or loss of a prosthetic appliance and death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer, incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extra hazardous duties incident to the business. The term does not include any communicable disease

unless the risk of contracting the disease is increased by the nature of the employment, injury caused by an employee's intoxication or by his wilful intention to injure or kill himself or another, and injury due solely to the gross negligence of the injured employee;"

It is also noted that the burden-of-proof provisions of the old Occupational Disease Law [See § 10(a), ch. 200, Session Laws of Wyoming, 1969] are now incorporated in § 27–361(a), W.S.1957, C.1967, 1975 Cum.Supp., as part of the Worker's Compensation Act:

"The burden of proof in contested cases involving injuries which occur over a substantial period of time is on the employee to make proper proof of his claim by a preponderance of the evidence, and to also prove by competent medical authority that his claim arose out of and in the course of his employment, by showing by a preponderance of evidence that:

"(i) There is a direct causal connection between the condition or circumstances under which the work is performed and the injury;

greater industrialization to Wyoming, a clear understanding of our approach to compensation in the field of occupational disease is imperative.

The majority opinion, as I read it, seems to treat the instant case as purely fact-oriented. I, on the other hand, would view the appeal as representing a misunderstanding or, if you will, a misapplication of the law as it relates to the facts presented. Once the proper legal standards are applied, it would have been my holding that the appellant did in fact satisfy her statutory burden of proof. This being so, I would direct that she should have been awarded appropriate compensation for the death of her husband, out of the fund established by his last employer, the appellee.

The Worker's Compensation Act and, I would argue, the Occupational Disease Law, are to be liberally construed so that, to the extent provided by law, the industry and not the individual worker should bear the burdens of the worker's injuries or disease suffered and contracted while employed in a covered occupation. See *Wyoming State Treasurer ex rel. Workmen's Compensation Dept. v. Boston*, Wyo., 445 P.2d 548; and Session Laws of Wyoming, 1969, ch. 200, Section 22 [repealed in 1975, supra], which provides:

"Except as herein provided in the Occupational Disease Law, all of the provisions of the Workmen's Compensation Act for the State of Wyoming relating to rights, notices, filings, remedies, proceedings, benefits, awards, penalties, assessments, and all other liabilities and limitations whatsoever, insofar as they may be pertinent and applicable and not inconsistent with the provisions of the Occupational Disease Law, shall apply under said Occupational Disease Law."

Although the provisions of the Worker's Compensation Act and the Occupational Disease Law may vary, their spirit does not. Even so, in these dissenting remarks, I make room for the fact that, even in light of our liberal construction, the court may not extend the purposes of these laws to injuries or diseases that do not reasonably fall within the ambit of the statutory language used. See *In re Hardison*, Wyo., 429 P.2d 320. I am also mindful of the rule so often reiterated by this court that evidence on appeal should be viewed in a light most favorable to the prevailing party. I do not, however, hold that this rule should be applied in its most devastating context when the relevant legal standards are either misunderstood or misstated, as I believe is the case here.

My research indicates that Wyoming took its burden-of-proof language, as set forth in § 27–297(a) [Section 10(a)] of the Occupational Disease Law (see Footnotes 1 and 2) from the statutes of Virginia, Illinois or Indiana. See Va.Code § 65.1–46 (1973)[3]; Ill.Ann.Stat., ch. 48, § 172.36(d) (Smith-

"(ii) The injury can be seen to have followed as a natural incident of the work as a result of the employment;

"(iii) The injury can fairly be traced to the employment as a proximate cause;

"(iv) The injury does not come from a hazard to which employees would have been equally exposed outside of the employment; and

"(v) The injury is incidental to the character of the business and not independent of the relation of employer and employee."

3. Va.Code § 65.1–46 (1973), provides:

"As used in this Act, unless the context clearly indicates otherwise, the term 'occupational disease' means a disease arising out of and in the course of the employment. No ordinary disease of life to which the general public is exposed outside of the employment shall be compensable, except:

"(1) When it follows as an incident of occupational disease as defined in this title; or

"(2) When it is an infectious or contagious disease contracted in the course of employment in a hospital or sanitarium or public health laboratory.

"A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

"(1) A direct causal connection between the conditions under which work is performed and the occupational disease,

"(2) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,

"(3) It can be fairly traced to the employment as the proximate cause,

Hurd 1976)[4]; and Ind.Code Ann. § 22–3–7–10 (Burns 1974)[5]. In these states, only a

general definition of "occupational disease" is set forth in their statutes, while in Wyo-

"(4) It does not come from a hazard to which workmen would have been equally exposed outside of the employment,

"(5) It is incidental to the character of the business and not independent of the relation of employer and employee, and

"(6) It must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction."

4. Ill.Ann.Stat., ch. 48, § 172.36(d) (Smith-Hurd 1976), provides in pertinent part:

"In this Act the term 'Occupational Disease' means a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment. Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public.

"A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence.

"An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when, for any length of time however short, he is employed in an occupation or process in which the hazard of the disease exists; provided however, that, in a claim of exposure to atomic radiation, the fact of such exposure must be verified by the records of the central registry of radiation exposure maintained by the Department of Public Health or by some other recognized governmental agency maintaining records of such exposures whenever and to the extent that the records are on file with the Department of Public Health or the agency."

The predecessor of the Illinois statute was somewhat more detailed. Ill.Ann.Stat., ch. 48, § 172.36(d) (Smith-Hurd 1966), provided in pertinent part:

"In this Act the term 'Occupational Disease' means a disease arising out of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the said diseases follow as an incident of an occupational disease as defined in this Section.

"A disease shall be deemed to arise out of the employment only if there is apparent to

the rational mind, upon consideration of all the circumstances, a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

"An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when for any length of time however short, he is employed in an occupation or process in which the hazard of the disease exists; provided however, that in a claim of exposure to atomic radiation, the fact of such exposure must be verified by the records of the central registry of radiation exposure maintained by the Department of Public Health or by some other recognized governmental agency maintaining records of such exposures whenever and to the extent that the records are on file with the Department of Public Health or the agency."

5. Ind.Code Ann. § 22–3–7–10 (Burns 1974), provides:

"(a) As used in this act [22–3–7–1—22–3–7–38], the term 'occupational disease' means a disease arising out of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident of an occupational disease as defined in this section.

"(b) A disease shall be deemed to arise out of the employment, only if there is apparent to the rational mind, upon consideration of all of the circumstances, a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been

ming we have a general definition of "occupational disease" *and* a schedule or list of compensable occupational diseases. See § 27–290(a) [Section 3(a)], supra, of the Occupational Disease Law. Even so, the statutes of these states point to various factors which are designed to show that the disease "arose out of and in the course of his employment," for the purpose of setting apart such diseases from those which might just as readily be contracted in other occupations or in life's other pursuits which are unrelated to the employment. See 1A Larson's Workmen's Compensation Law, § 41.-32, at 7–264 (1973); *Rockford Transit Corporation v. Industrial Commission*, 38 Ill.2d 111, 230 N.E.2d 264, 265 (1967); and *Van Geuder v. Commonwealth*, 192 Va. 548, 65 S.E.2d 565, 567 (1951). See also Angerstein, "Legal Aspects of Occupational Disease," 18 Rocky Mountain Law Review 240, 263–264 (1945). It is with this purpose in mind that I would analyze the meaning of § 27–297(a) [Section 10(a)], supra.

In a contested occupational-disease case, I see the claimant's burden as twofold: (1) He or she must show by competent medical evidence that his or her claim *arose out of and in the course of* the worker's *employment*—this burden is discharged if the five factors set forth in § 27–297(a) [Section 10(a)], supra, are satisfied; and (2) the claimant must show for which employer the worker was working when he received his *last injurious exposure.*

## CONNECTION TO EMPLOYMENT

In satisfying the burdens of the first step, as they relate to § 27–297(a) [Section 10(a)], supra, the meaning of the word "employment" becomes critical. It is here that I would hold the trial court to have first erred in delineating or construing the appropriate legal standards. In interpreting the predecessor of Virginia's parallel sec-

tion, the Supreme Court of Appeals of Virginia, in *Pocahontas Fuel Co. v. Godbey*, 192 Va. 845, 66 S.E.2d 859, 863–864 (1951), agreed with the majority opinion of the Industrial Commission of Virginia to the effect that:

" 'The word "employment" as used in the foregoing statute is not used as it is elsewhere in the Act to describe the relation between employer and employee. In this statute the word refers to the work or process in which the employee has been engaged and not to his contract with an employer to engage in it. *Blatchford v. Staddon and Founds*, L.R. 1927, App.Cas. p. 461; *Pacific Indem. Co. v. Industrial Accident Commission*, 86 Cal.App.2d 726, 195 P.2d 919, 920; *Anderson v. Roberts-Karp Hotel Co.*, 171 Minn. 402, 214 N.W. 265; *State v. Foster*, 37 Iowa 404, 407; *White v. Rio Grande Western R. Co.*, 25 Utah 346, 71 P. 593, 594; *Elm Springs Canning Co. v. Sullins*, 207 Ark. 257, 180 S.W.2d 113, 115; *State v. Birmingham Beauty Shop*, 240 Ala. 170, 198 So. 435, 436.

" 'Where there is a direct causal connection between the employee's several employments and his disability resulting from silicosis, so that the occupational disease is in effect a single injury caused in part at least by injuries incurred in employment of the several employers, the occupational disease is compensable as "arising out of and in the course of employment". *Niedzwicki v. Pequonnock Foundry*, 133 Conn. 78, 48 A.2d 369. The fact that the disease did not originate during the claimant's employment with the defendant will not operate to relieve the defendant of liability.'

\*　　\*　　\*　　\*　　\*　　\*

"Though an employee suffering from an occupational disease may have contracted it while in the employ of some other employer, or once contracted, the

---

equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or ex-

pected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

disease may have been augmented and aggravated while in the successive employ of several employers, yet section 65–47, Code of Virginia 1950, restricts and limits his right of action to one employer and its insurance carrier. It reads:

" 'When an employee has an occupational disease that is covered by this Act, the employer in whose employment he was last injuriously exposed to the hazards of the disease and the employer's insurance carrier, if any, at the time of the exposure, shall alone be liable therefor, without right to contribution from any prior employer or insurance carrier.'

"It is thus seen that section 65–42 requires that an employee establish that his occupational disease arose 'out of and in the course of the employment', yet he is not required to prove that its incipiency took place or that it originated while he was working for the employer who is made liable to him. This is true because section 65–47 expressly limits his right of action to the employer in whose employment he was last injuriously exposed to the hazards of the disease. He is not required to prove that his occupational disease was contracted while he was working for any particular employer, but merely to establish by a fair preponderance of evidence in whose employ he was last injuriously exposed. *Bye v. Interstate Granite Co.*, 230 N.C. 334, 53 S.E.2d 274, and *Textileather Corp. v. Great American Indemnity Co.*, 108 N.J.L. 121, 156 A. 840.

"It is immaterial that he may have been in the employ of another or others at the incipiency of or during the slow and insidious progress of the malady. The statute expressly holds liable the employer in whose employ he was when last injuriously exposed to its hazards, irrespective of when or in whose employ he was when the disease was first contracted. And the phrase 'last injuriously exposed', as used in the statute, means an exposure or contact with the dangers of the disease which proximately causes the malady, or augments or aggravates the pre-existing disease. *Haynes v. Feldspar*

*Producing Co.*, 222 N.C. 163, 22 S.E.2d 275; *Bye v. Interstate Granite Co.*, supra. . . . ."

The decisions of the courts of another state from whence came legislation in question are very persuasive when construing statutes which are identical or very similar to those enacted by our own legislature. *Wilson v. Martinez*, 76 Wyo. 196, 301 P.2d 785, reh. den., 76 Wyo. 196, 307 P.2d 605. See also *Woodward v. Haney*, Wyo., 564 P.2d 844, 845 (1977). Given the uniqueness of a provision such as that contained in § 27–297(a) [Section 10(a)], supra, it can be presumed that the Wyoming legislature borrowed the language therein from Virginia, Illinois or Indiana. Even if this were not the case, I would hold that the reasoning of *Pocahontas Fuel Co. v. Godbey*, supra, is equitable, logical, consistent with the intent of the Wyoming legislature and should be adopted by this court. No appreciable difference arises from the fact that Wyoming's provision is not directly connected to the definition of "occupational disease," since it is still considering whether or not the disease "arose out of or in the course of his employment."

The lesson to be derived from the preceding discussion, and under which the specific provisions of § 27–297(a) [Section 10(a)], supra, should be understood in the context of the present case, can be stated as follows: Where there is a direct causal connection between the worker's several employments and his disability or death, the occupational disease is compensable as "arising out of and in the course of the employment." This test in no way detracts from the express language set forth by the legislature—it merely places that language in its proper perspective. There seems to be no question but that a malignancy caused by radiation poisoning and exposure is a compensable occupational disease. § 27–290(a)(xxii) [Section 3(a)(xxii)] of the Occupational Disease Law, supra. The problem during the first stage of proof is to show that the malignancy had a direct causal connection with the worker's several employments.

The hazard with which the instant case is concerned is radiation exposure. The claimant's husband worked as an underground uranium miner from January 3, 1958 to December 29, 1971—a period of some 13 years. The record discloses that during the course of such employment his exposure to radiation was equivalent to at least 926 Working Level Months. After the worker's body was disinterred, a radiometric analysis of his bone specimens revealed an adjusted concentration of lead-210 of 1.63 picocuries lead per gram of tissue. The normal concentration of lead-210 in the dead bone tissue of the general non-mining public ranges from .01 to .05 picocuries lead-210 per gram of tissue, according to studies disclosed by expert witness Dr. Archer's testimony. These studies also disclosed that among the general non-mining public, extremely heavy smoking would only raise the concentration to about .06 to .08 picocuries lead-210 per gram of tissue. Dr. Archer, as pointed out in the majority opinion, testified under cross-examination that he could not be certain that the worker's death "occurred or was caused *solely* by radiation exposure." [Emphasis supplied] But Dr. Archer later went on, under cross-examination, to state:

"One cannot be absolutely sure in a situation like this, but I would say most probably his [Mr. Olson's] lung cancer resulted from his occupational exposure to radiation."

The appellee's own expert witness, Dr. Connell, testified in response to a hypothetical question, assuming the facts of the instant case, that the worker probably contracted lung carcinoma during his period of work with "Mining Company A" [Continental Uranium Co.]. The only testimony which even obliquely attempts to contradict these assertions is the admission by both experts that cigarette smoking *can* be the sole cause of the type of cancer the worker contracted. There is no evidence disclosed in the record which indicates that the worker's lung cancer *was probably caused* by his cigarette smoking. However, as I note above, there *was* evidence that Olson's cancer "most probably" resulted from his occupation.

The burden of the claimant, under § 27-297(a) [Section 10(a)], supra, is to prove his or her claim by a preponderance of the evidence. This can be taken to mean that there must be proof which leads the trier-of-fact to find that the existence of a contested fact is more probable than its nonexistence, as distinguished from proof which is clear and convincing. In my judgment, the medical evidence here is sufficient to show that the claimant's husband "most probably" (Dr. Archer, supra) died as a result of radiation exposure which occurred during his several employments. The existence of heavy cigarette smoking cannot be discounted, but in this case the appellee has offered no reason to believe that the likelihood of contracting lung cancer from smoking was more than a mere possibility. See *McAllister v. Workmen's Compensation Appeals Board*, 69 Cal.2d 408, 71 Cal.Rptr. 697, 702–703, 445 P.2d 313, 318–319 (1968). I think a claimant has proven his or her claim according to the statute's burden-of-proof requirements when a medical expert states without direct contradiction that the worker "most probably" died of an occupational exposure to radiation—as opposed to testimony to the effect that there is a "possibility" that death was otherwise causally connected. See *McAllister v. Workmen's Compensation Appeals Board*, supra, 71 Cal. Rptr. at 701, 445 P.2d at 317. We cannot demand that experts be more certain, since the industrial causation itself need only be more probable than not.

To be sure, it may be effectively argued that when a doctor says something is medically "possible," this is conjecture and speculation—even when uttered by a doctor. But, we have held that when a doctor gives an opinion in terms of medical "probability," his opinion is not speculative and it is admissible as an expression of his belief and judgment.

We said in *Rocky Mountain Trucking Company v. Taylor*, 79 Wyo. 461, 478–479, 335 P.2d 448, 452–453:

"As to the charge that the testimony dealt with possibilities rather than probabilities, that is completely refuted both by

the questions asked and the answers given. For the most part the doctor stated what he believed or what he said were probabilities. . . .

"We also do not agree that the statement of what a qualified medical expert believes or says is probable may correctly be described as conjecture, at least in a legal sense. Everything which is not in being has some aspect of conjecture. In the affairs of men we have come to accept as sufficiently reliable for us to act upon the considered belief and judgment of those whose study, training and experience lend their opinions and beliefs to our acceptance."

Before receiving her compensation, it is not the claimant's duty to remove every other possible cause of her husband's death. Once the medical "probability" evidence is in the case and the employer seeks to deny responsibility for the death by attributing it to causes for which it is not responsible, the employer must then assume the burden of proving the cause of death to be other than occupationally related. See *Bolger v. Chris Anderson Roofing Co.*, 112 N.J.Super. 383, 271 A.2d 451, 458 (1970). The claimant here, when the doctor testified that the death-causing lung cancer "most probably . . . resulted from his occupational exposure to radiation," did all that she was required to do to satisfy her burden of proof under § 27–297(a) [Section 10(a)], supra. The employer failed, on the other hand, to sustain its burden of proving that the cause of death was other than employment-connected.

It might be worthwhile to observe that much of the confusion in this matter may have arisen out of the "proximate cause" language contained in § 27–297(a)(iii) [Section 10(a)(iii)], supra. I would first observe that the disease need only be "*fairly traced* to the employment as the proximate cause." [Emphasis supplied] The claimant here has certainly satisfied this requirement. Second, the normal conception of "proximate cause" is suffused with the tort conception of fault—which has no place in compensation law. 1 Larson's Workmen's

Compensation Law, § 6.50 (1972). Proximate or legal cause usually demands that the harms be foreseeable, but foreseeability has no relevance to the theory of compensation liability. This is true, particularly when we are reminded that in Wyoming, worker's compensation, and, therefore, occupational disease compensation, are based on accident or disease-insurance concepts. See *Zancanelli v. Central Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981, 989–990; *Hotelling v. Fargo-Western Oil Co.*, 33 Wyo. 240, 238 P. 542; *In re Byrne*, 53 Wyo. 519, 86 P.2d 1095, 1101; *Fuhs v. Swenson*, 58 Wyo. 293, 131 P.2d 333, 337; and *Markle v. Williamson*, Wyo., 518 P.2d 621. These types of cases speak the language of industrial insurance liability—not fault. In consequence, the statutory burden-of-proof section should not be read to require a showing of foreseeability, but rather that the disease probably had its origin in a risk associated with the employment. If the evidence shows that it is just as probable that death resulted from a cause which is not compensable, as it is that it resulted from one which is compensable, the claimant has not sustained the burden of proof. *Van Geuder v. Commonwealth*, supra, 192 Va. at 571, 65 S.E.2d 565. But if the claimant shows that it is most probable that death resulted from an occupational exposure, as here, the burden is sustained and compensation should be awarded.

I would note that the present case, as it relates to the issue of employment-connection, is distinguishable from the situation presented in *Hammond v. Hitching Post Inn*, Wyo., 523 P.2d 482. In *Hammond*, the worker—who was a heavy cigarette smoker—contracted chronic bronchitis. This court held the worker failed to prove his bronchitis resulted from work conditions, which, independently of any other cause, produced the disease for which compensation was sought. In that case, there was medical testimony to the effect that the worker's heavy cigarette smoking "could have contributed as much to bronchitis as did dust," or could have easily come from a hazard to which he would have been equally exposed outside of his employment.

No such testimony is present in the instant case. Secondly, in *Hammond* we were dealing with a disease not included in the schedule of compensable diseases. See § 27–290(a) [Section 3(a)], supra. As a result, the general definition of "occupational disease" had to be applied—with its requirement that the disease result from work "independently of any other cause." In the present case, we are concerned with a disease expressly included in the schedule. See § 27–290(a)(xxii) [Section 3(a)(xxii)], supra. Since radiation-caused malignancies are assumed to be compensable, if there is a probable work-connection, all other causes need not be eliminated.

I would have held, therefore, that the claimant sustained her burden of proof under § 27–297(a) [Section 10(a)], supra.

## LAST INJURIOUS EXPOSURE

During the second stage of proof, the claimant need not prove that the worker's occupational disease was contracted or induced while he was working for a particular employee, but the proof-burden will be deemed satisfied when it is established by a fair preponderance of evidence in whose employ he was "last injuriously exposed." *Pocahontas Fuel Supply Co. v. Godbey*, supra, 66 S.E.2d at 864. See also *Cooper v. Mary E. Coal Corporation*, 215 Va. 806, 214 S.E.2d 162 (1975), where a case was remanded for further evidence concerning the employee's injurious exposure during his employment with the defendant coal company.

The Occupational Disease Law defines "injurious exposure" as:

" . . . an exposure to such disease which is reasonably calculated to *bring on* the disease in question." § 27–289(d) [Section 2(d)], supra. [Emphasis supplied]

**6.** Va.Code § 65.1–52 (1973), defines "injurious exposure," in pertinent part, as follows:

" . . . an exposure to the causative hazard of such disease which is reasonably calculated to bring on the disease in question. . . ."

**7.** This is not a case, therefore, like *Climax Uranium Company v. Death of Smith*, 33 Colo.App. 337, 522 P.2d 134, where the claimant must

Virginia's definition of "last injuriously exposed" is substantially identical to our definition.[6] In *Pocahontas Fuel Co. v. Godbey*, supra, at 864, the court observed that

" . . . the phrase 'last injuriously exposed', as used in the statute, means an exposure or contact with the dangers of the disease which proximately causes the malady, *or augments or aggravates the pre-existing disease. Haynes v. Feldspar Producing Co.*, 222 N.C. 163, 22 S.E.2d 275. *Bye v. Interstate Granite Co.*, supra. . . ." [Emphasis supplied]

Since the claimant need not necessarily show that the disease was caused while in the employment of the party from whom he seeks compensation, emphasis should properly be placed on *aggravation* of the disease in cases such as the one at Bar. See *Masko v. Barnett Foundry & Machine Co.*, 53 N.J. Super. 414, 147 A.2d 579 (1958); and *State ex rel. Hall China Co. v. Industrial Commission*, 120 Ohio App. 374, 202 N.E.2d 628, 629, aff'd, 176 Ohio St. 349, 199 N.E.2d 739. Where the occupational disease is characterized as being gradual in development, and where several employers have been involved, it is incumbent upon the claimant to show that the disease was promoted or accelerated during his employment with the particular employer from whom compensation is sought. We are not concerned with an exposure which would *cause* the disease, only one which would be reasonably calculated to *aggravate, promote or accelerate* the disease.[7] Once some such contributing exposure is shown, the employer making that contribution is charged with full liability for the condition, even though it may have developed over a number of years. 4 Larson's Workmen's Compensation Law, § 95.21, at 77–87 (1976); and § 27–293

show an exposure to a concentration of toxic material which would eventually cause an occupational disease. See also *Mathis v. State Accident Insurance Fund*, 10 Or.App. 139, 499 P.2d 1331; and *White v. Scullin Steel Company*, Mo.App., 435 S.W.2d 711—where a claimant must show conditions which are conclusive to the development of the disease, as opposed to aggravation of the disease.

[Section 6] of the Occupational Disease Law.

The trial court in the case at Bar found, with respect to the last injurious exposure, as follows:

"That it is unable to find from the evidence that this Employer is the one in which the last injurious exposure occurred, neither is it able to make a contrary finding, and so that portion of the resolution of this case against the Claimant is made on the failure of the Claimant *to carry the burden of proof prescribed by statute*." [Emphasis supplied].

If the trial court meant that the claimant failed to meet the burden-of-proof requirements set forth in § 27–297(a) [Section 10(a)], supra, then the wrong legal standard was applied. As pointed out previously, this section is concerned *only* with whether the disease in question arose from the worker's several employments. It in no way relates to the last-injurious-exposure rule. If, on the other hand, the trial court was not referring to § 27–297(a) [Section 10(a)], supra, then it must have applied the wrong legal standard. The trial court seems to have relied on Dr. Archer's statement that the "last injurious exposure" was suffered when the worker was engaged in an earlier employment with Continental. But a review of the record indicates that this conclusion was premised on Dr. Archer's *own* definition of "last injurious exposure" as being an exposure in excess of the government standard, which at the times relevant herein were 4 Working Level Months per year. According to the appellee's evidence, the claimant's husband was exposed to 2.758 Working Level Months during his one-and-one-half-years' employment with the appellee. There is no question that this exposure is below the government standard. I would assert with some emphasis, however, that *the government radiation-exposure standards do not represent the proper criteria for determining the "last injurious exposure."*

In *State ex rel. Hall China Co. v. Industrial Commission,* supra, the employer from whom compensation was sought proved that its plant operated well within the recommended standard of maximum allowable dust concentration set by the Industrial Commission. Nevertheless, the court affirmed the Industrial Commission's award of compensation for claimant's exposure to silica dust. The concurring opinion in that case set forth persuasive reasoning for such a result when it said:

"Petitioner's principal contention involves the interpretation of the word 'injurious' as used in Section 4123.68(W) of the Revised Code. The interpretation suggested would in effect insert the element of employer fault into occupational disease cases. Liability for compensation, as opposed to liability for violation of a safety requirement, rests upon the injurious effect upon the claimant and not upon the injurious conduct of the employer."

I would subscribe to this observation, and would determine the employer's contribution to the disease on the basis of the exposure's effect on the worker, rather than on the quantity of the exposure to which the employer subjected him. This is just another way of saying that the Worker's Compensation Act and Occupational Disease Law of this state are industrial-accident-insurance oriented, with minimal association with the doctrine of tort. In this context, it is immaterial whether the government safety standards have been complied with or not. The relevant consideration is the effect of *some* radiation exposure on a uranium miner who has probably already contracted cancer as a result of his work in the uranium mining industry.

The record is replete with testimony as to the promoting or accelerating effect of *any* radiation exposure. Dr. Archer explained this effect in the following discourse:

"Q. (By Mr. Zollinger) Taking the one unit or one measure of radiation, which we'll call Working Level, each unit that the human being receives is not greater nor less injurious than any other unit that person has received; is that correct?

"A. Yes. That's probably true on a theoretical basis; but in actual practice

there, the effects might well be different because of the time element. The time element for the first unit received might be compatible with the development of cancer, whereas the last one received might not be.

"Q. Could you elaborate on that or explain that?

"A. The length of time for the induction, induction-latent period between when the man first started mining and when he developed cancer, among uranium miners is usually around 15, 16 or 17 years average time. The minimum time of this period, it's been noted in uranium miners, is somewhere around four or five years. So that the unit of radiation which the man received, say, 15 or 20 years earlier would be more likely to be associated with his present cancer than a comparable unit received one year before cancer developed. But even this isn't completely true because even though the last units of radiation received—even though it might not be held responsible for initiating his cancer, it still might be of help in promoting or speeding up the cancer, because there are many things which act as promoting agents for tumors. Sometimes the same agent which induces them may also promote them.

\* \* \* \* \* \*

"Q. So that referring now to our hypothetical case, if the miner's disease, which is diagnosed as small-cell carcinoma, is diagnosed within two or three years of employment from mining company 'B' then would you say that would be circumstantial evidence that the cause of the carcinoma was not the exposure received from employment with mining company 'B'?

"A. Yes. I would say that most probably. However, one could not completely dismiss that last radiation because, although it's pretty certain it did not induce the cancer, it still might have had some sort of promoting effect to cause it to appear a little sooner.

\* \* \* \* \* \*

"Q. Your statement that the period in which the claimant received the greatest amount of exposure is the probable cause of the induction of cancer, does that statement preclude the possibility of further injurious exposure subsequent to the induction of cancer?

"A. No, because it can't exclude the possibility that the later radiation acts as a promoting agent for the tumor which was induced at an earlier date.

\* \* \* \* \* \*

"Q. Could exposure to radiation subsequent to the induction of a tumor be described as injurious?

"A. Under some circumstances, it could, yes.

"Q. Could that exposure promote or accelerate a clinical tumor?

"A. I think the answer to that depends somewhat on the amount of that exposure. I would say it's—if it was a substantial amount, then yes."

The only response to this testimony came in an exchange to which Dr. Connell responded as follows:

"Q So in all cases, and I assume your testimony to be about latency—in all cases in which the carcinoma is found in a uranium miner, it would be your testimony that the carcinoma was essentially developed several years prior to that?

"A Essentially developed, yes.

"Q And that all of the exposure that occurred subsequent to the beginning of the initiation of that latent period is just kind of water over the dam, it doesn't have any effect whatever on the carcinoma?

"A Yes, I think that's right."

I do not view Dr. Connell's observation as a direct contradiction of the testimony of Dr. Archer, but rather as a statement which indicates that once the carcinoma is induced, then further exposure to radiation will not have a *causative* effect. This is not to say that some subsequent radiation exposures will not have a *promoting* effect. The subsequent exposures need not have a *substantial* effect—only *some* effect is required. 4 Larson's Workmen's Compensa-

tion Law, § 95.21, supra. I am convinced by a reading of the entire record that there was sufficient evidence presented which would indicate that the radiation exposure received at the appellee's mine promoted or accelerated the cancer which killed the claimant's husband. This is particularly true in light of Dr. Archer's uncontradicted testimony that, theoretically, "any amount of radiation received by a person would probably be injurious to some small extent." We are involved in an area which does not lend itself to medical certainties—only to probabilities and likelihoods. That in itself, of course, is no reason to provide compensation because, if it were, compensation would have to be awarded whenever the claimant suffered a little-known-about ailment. I do not suggest that this course be followed. I only suggest that when it is probable that a worker died of an occupational disease, and when it is further probable that the employer, from whom compensation is sought, has contributed to the disease in some way, then that employer should bear the burden of compensation.

Had I been writing for the majority, I would have reversed the trial court's judgment.