The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
This matter was heard by Deputy Commissioner Morgan Chapman in Newton on June 24 and 25, 1992, and March 17 and 18, 1993. In addition to the evidence received at the hearings, plaintiff submitted deposition testimony of three medical experts: a psychiatrist at Duke, Dr. Jonathan Davidson; a neurologist at Duke, Dr. Donald Schmechel; and a family practitioner, Dr. Marc Guerra. Defendants Caldwell Systems, Inc. ("CSI") and Liberty Mutual Insurance Company submitted deposition testimony of a neurologist, Dr. Mitchell Freedman. Defendant Davis Wood Products ("Davis") as self-insured submitted deposition testimony of another neurologist, Dr. Peter D'Onofrio. Defendant Davis through its insurance carrier, Reliance Insurance Company, and defendants Autumn House, Aegis Administrative Services, and CIGNA Insurance Company did not submit any additional deposition testimony.
Deputy Commissioner Chapman's 27 June 1994 Opinion and Award determined that plaintiff had not carried his burden of proof that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with the defendant Caldwell Systems and denying the claim. Plaintiff filed an Application for Review on July 13, 1994, and the matter is now before the Full Commission. Plaintiff did not, however, seek review by the Full Commission of the Opinion and Award to the extent that the defendant Autumn House, both as self-insured and as insured by CIGNA Insurance Company, was determined not to be liable. Plaintiff thus abandoned any appeal of Deputy Commissioner Chapman's decision with regard to Autumn House and its carrier and those parties have been dismissed from the case.
STANDARD OF REVIEW
On this appeal, the Full Commission's review is plenary, and "[a]ll questions arising under this Article if not settled by agreement of the parties interested therein, with the approval of the Commission, shall be determined by the Commission. . . ." N.C. Gen. Stat. § 97-91. The Commission, not the deputy, is to make the final findings of fact as well as conclusions of law, and on appeal the Commission must review the entire record to make its own determinations. N.C. Gen. Stat. § 97-85;see. e.g., Faircloth v. N.C. Dept. of Transportation,106 N.C. App. 303, 416 S.E.2d 409 (1992); Blankley v. White SwanUniform Rentals, 107 N.C. App. 751, 421 S.E.2d 603 (1992); Pollardv. Krispy Waffle Number One, 63 N.C. App. 354, 304 S.E.2d 762
(1983).
After a thorough review of the entire record in this case, the Full Commission finds and concludes that plaintiff has compensable occupational diseases of chronic toxic encephalopathy and post traumatic stress disorder caused by his employment with the defendant Caldwell Systems, Inc., that he is totally disabled from these conditions, and that he is entitled to an award of a ten percent penalty against the defendant Caldwell Systems, Inc. The Full Commission finds and concludes that Plaintiff was last injuriously exposed to the hazards of such disease while an employee of Defendant Davis Wood Products and during the last three months of such employment, i.e., February, March and April of 1990, when Plaintiff worked in the glue room and was constantly exposed to glue fumes. Defendant Davis Wood Products was self insured during that period of time. Under our law, Davis Wood Products as employer and self-insurer during the period of last injurious exposure is responsible for disability compensation and medical compensation.
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as
STIPULATIONS
1. At the time of the alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant Caldwell Systems, Inc. and plaintiff from August 12, 1981 to December 15, 1985.
3. Liberty Mutual Insurance Company was the carrier on the risk in I.C. 107316.
4. Plaintiff's average weekly wage was $207.68 with defendant Caldwell Systems, Inc.
5. Plaintiff was employed by defendant Davis Wood Products from May 9, 1989 through April 30, 1990, and during that period of time the employment relationship existed and the employer had more than three employees. From May 9, 1989 through January 1, 1990, Reliance Insurance Company was the carrier on the risk, and from January 2, 1990 through April 30, 1990, defendant Davis was self-insured.
6. Plaintiff was employed by defendant Autumn House, Inc. from May 29, 1987 through October 19, 1988, and during that period of time the employment relationship existed and the employer had more than three employees. Autumn House was self insured with Aegis Administrative Services as the adjusting company for an unspecified period and was insured by defendant Cigna Insurance Company for an unspecified period during the time of plaintiff's employment.
7. Plaintiff's average weekly wage while working at Autumn House may be determined from wage information offered by the parties.
8. Plaintiff's average weekly wage while working at Davis Wood Products may be determined by a Form 22 submitted by defendant.
The parties submitted written stipulations at both hearings which are incorporated by reference. In addition, they stipulated into evidence medical reports by written stipulation in November 1993.
* * * * * * * * * * * *
EVIDENTIARY RULING
Exhibits were offered at the original hearing for which objections were not ruled upon at the time. Except for the following exhibits, they have been received into evidence.
Plaintiff's Exhibits 21, 25 and 34 were not received into evidence over objection. Defendants' Exhibits 2, 3, 4, 10, 12, 13, 14 and 17 were not received into evidence over objection. Most of the excluded exhibits were not relevant to the claim in question but were relevant to the other claims which were consolidated for hearing with the Taylor case.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings of fact made by Deputy Commissioner Chapman and makes the following:
FINDINGS OF FACT
1. Plaintiff is 38 years old, having been born in 1957, and has a ninth grade education. He did poorly in school (he has difficulty reading and can only understand simple words) and dropped out when he was sixteen years old. He then worked for furniture factories and fast food restaurants except for approximately four and one-half years when he was incarcerated for breaking and entering and larceny of firearms.
2. On August 12, 1981 plaintiff began working for defendant Caldwell Systems, Inc. (CSI), a facility which stored and incinerated certain hazardous wastes. The wastes were separated at the facility according to their flammability and their consistency into liquids, sludge and solids. They were stored in drums, in enclosed tanks and in an above-ground open tank referred to by the employees as the "pit". Some wastes were processed through the "cowle", a blending machine which would liquify sludge or solid type materials. The various wastes were pumped or otherwise transported to the incinerator where they were burned at high temperatures. The toxic nature of the waste is uncontradicted. Plaintiff's Exhibit 3, taken from CSI's EPA permit application, lists the wastes processed by CSI as including "waste solvents, tank bottoms from fuel storage tank cleaning, degreasing solvents, waste oils, solids from clean-out of furniture finishing and paint or lacquer spray booths, paint sludge, waste glues, waste resins, waste inks, and contaminated/off specification fuels." Exhibit 3 then contains a table identifying typical laboratory analyses of the wastes, including such toxic materials as waste ink, waste paints, waste solvents, wastes containing various metals, and many other toxic chemical substances in waste form.
2. CSI's expert, Dr. Freedman, conceded, and the Full Commission finds, that exposure to these wastes can be harmful and can cause toxic encephalopathy.
3. Before working at CSI, Plaintiff held a variety of jobs. When he was in his teens he mowed grass, hand-sanded for a furniture company, built boxes for a mirror company, and worked as a grill cook at a fast food restaurant. He had no exposure to glue, paint or other chemical fumes while working on these jobs. At age 18 he was convicted of breaking and entering. During his prison term he made honor grade and was placed on work release, where he worked at another furniture factory running saws. He had no chemical exposure at this work site. Plaintiff also attended courses at Caldwell Community College to prepare to get a GED and to learn how to interview for a job. Before he began working at CSI, the evidence is uncontradicted that Plaintiff never had any problems with depression, violent behavior, irritability, headaches or balance. His girlfriend testified that he was pleasant tempered when she knew him at school. His health generally was good.
4. Plaintiff was hired at CSI as a sludge worker. His job duties included pouring sludge from one drum to another, cleaning tanks, shoveling or throwing wastes into the resin tank, pumping wastes out of drums or tankers and cleaning out the various holding tanks. When he cleaned a tank, he would go through a manhole to enter it, would stand in the sludge, and would shovel it into a bucket or directly out of the manhole. He worked in this position for approximately two and one-half years and then was promoted to assistant operator. In that job he continued to do his former duties but spent more of his time at the incinerator where he would shovel and throw waste material into the machine. Approximately once a week he would shovel out the hot ashes from inside the incinerator. A mechanical scoop which attached to the motor was later provided to clean the incinerator, but plaintiff still had to shovel ashes from areas where the scoop could not reach.
5. For about two and one-half years, the only safety equipment provided to the employees were gloves and they were not provided on a consistent basis, so the employees would often use gloves that came into the facility in drums as waste products. Throughout the course of the workday, waste material would splash or spill onto plaintiff as he was emptying drums, cleaning storage tanks, and shoveling waste material. His clothes would soak up the chemicals and would often be stiff at the end of the day. The chemicals also came in contact with his skin, especially on hot days when he might work without a shirt.
6. Besides the physical contact with the waste material, plaintiff and the other employees also breathed fumes from it. The most noxious fumes came from Otto fuel waste which the Navy shipped to the facility. Employees who breathed those fumes would usually develop a severe headache and nausea and would often vomit. The fumes inside the holding tanks were also very strong. Plaintiff was one of the few employees who could work inside of one for any length of time. There was a general stench throughout the facility from the various waste materials, and the ashes from the incinerator gave off such a strong odor that an employee could not shovel them for very long before he would have to stop.
7. During this period of employment, plaintiff and the other employees experienced severe headaches, nausea, vomiting, rashes, light headedness and watery eyes depending upon the nature of the exposure. In addition, plaintiff experienced three exposures which caused him to go to the emergency room. He was seen in November 1981 for complaints of chest pain, shortness of breath and vertigo after working inside a tank. In October 1982 he was treated for eye problems after solvent sprayed into them, and on September 1, 1983 styrene monitor liquid poured out of a drum onto his head and shoulders causing him to experience burning of his skin, shortness of breath and headache. He was taken to the emergency room where he was treated and released, but he subsequently returned complaining of difficulty breathing so they admitted him to the hospital. His condition was diagnosed as mild acute bronchitis secondary to chemical burn and first degree burns of the skin of his chest and face.
8. In late 1983 or early 1984, CSI instituted a safety program and began to provide its employees with respirators and Tyvek suits, which were worn over their clothes. It also purchased what the employees referred to as a "space suit", which would connect to an independent air supply, for them to wear while working inside the tanks. Consequently, the employees' exposures to the waste materials were significantly reduced. However, filters were not always available for the respirators and there were occasionally problems with the air supply to the space suit. The employees would continue to perform their job duties on these occasions despite the problems with the safety equipment.
9. In September 1983, Plaintiff was involved in a major accident at the facility when an entire 55-gallon drum of styrene fell from a stack of drums and poured over him. As Mr. Ashline described, "it looked like just a large waterfall came out of the top of the drum and just covered him and the tow motor at the same time." When the spill occurred, Plaintiff was shirtless and wore no more than a pair of cotton work pants and steel-toed boots. The styrene was gluey and stuck all over Plaintiff's skin, causing him to feel burning over his body and have difficulty breathing. According to Mr. Ashline, "the way he was screaming, I believe we all thought he was dead." As his co-workers tried to scrub Plaintiff off under a shower, Plaintiff kept screaming that he thought he was dying and eventually lost consciousness. He was treated at the emergency room and released, but after he returned home he experienced more difficulties including a seizure-like episode. He was admitted to the hospital for several days for his chemical exposure and respiratory distress. During the hospitalization, doctors noted that Plaintiff developed moderately severe vascular headaches possibly secondary to the chemical spill.
10. Over the four and one-half year period that Plaintiff worked at CSI, he began to notice changes in his physical and mental health. After the styrene spill in September 1983 he felt acute fear. He was preoccupied with his memories of the event and would involuntarily experience what happened, both during the daytime and through horrifying nightmares. The nightmares at first were almost entirely about the accident. (Davidson Depo., Exhibit 1) In addition to the sickness he felt at work, Plaintiff testified that he began to feel sick away from work with headaches and breathing problems. He began to be irritated by little things and began staying away from people.
11. After he left CSI, Glenn Ray Taylor worked briefly for Fox River Furniture building frames until the plant closed. He worked for several weeks at Hardee's. He worked for only a few days tailing a saw at Hamry's and quit because he couldn't keep up with the work. During this time period he still had health problems, including headaches, mood changes, and nightmares that had become generally related to themes of violence and danger with imagery from the styrene spill woven into them. He had started becoming physically and emotionally upset when he encountered things that reminded him of the spill, such as smelling chemicals, seeing storage barrels or talking about the event. When he got upset at reminders, it produced a feeling of knots in his stomach, shortness of breath, tendency to fly off the handle, feelings of dizziheadedness, and prolonged tearfulness.
12. In August of 1987, Dr. Guerra noted Plaintiff's report of weight loss, memory difficulties, and impulsive behavior with anxiety and nervousness, and referred Plaintiff to the North Carolina Memorial Hospital again for evaluation of the mental status changes, lung disease and weight loss. Plaintiff was seen by Dr. Robert Gwyther in the Department of Family Medicine and was evaluated by Dr. Pasternak in Occupational Medicine. Dr. Pasternak was impressed by the patient's memory of some toxic accidents and his "vivid nightmares of the accidents," and his condition was "suggestive of a post-traumatic stress disorder (PTSD) following a chemical exposure." In his discharge summary, Dr. Gwyther diagnosed Plaintiff as having "probable post-traumatic stress syndrome."
13. Dr. Marc Guerra is board certified in family practice and testified as an expert witness in family medicine. Over the time that he has treated Plaintiff, Plaintiff's primary symptoms have been affective, including irritability, explosiveness, and difficulty in controlling his temper. He also has had headaches intensified by heat intolerance, difficulty with balance, problems with memory and joint pains. Over time Plaintiff's balance and affective disorder have worsened. Plaintiff also developed problems with syncope, or falling-out spells related to his autonomic instability. It is Dr. Guerra's opinion that the affective problems are most disturbing in that "his mood is very labile. He remains explosive and very unpredictable." Dr. Guerra has observed Plaintiff's explosive mood changes first-hand:
 He can't tolerate sitting for two minutes without precipitating and pacing all over the office and coming back and trying to get into an examination room and acting inappropriately. . . . I think that his affect does change. His irritability does change. He is unpredictable. I think he is dangerous. You know, I think he needs intense psychiatric care. I don't trust him with my nurses alone. I don't trust him at my front desk alone. I don't trust it to be alone with him at times.
14. Significantly, Dr. Guerra noted as early as 1987 that Plaintiff described the vividness of the styrene spill episode, reported fatigability, and memory problems. Dr. Guerra's opinion to a reasonable degree of medical certainty was that Plaintiff has a neuropsychiatric disorder consisting of an organic affect disorder and toxic encephalopathy involving neurologic abnormalities, along with post-traumatic stress disorder (PTSD). In Dr. Guerra's opinion, the organic affective syndrome and toxic encephalopathy were caused by Plaintiff's exposure to chemicals while working at Caldwell Systems, which placed Plaintiff at increased risk of developing his neuropsychiatric problems.
15. Dr. Guerra testified and the Full Commission finds that Plaintiff has psychiatric and physical limitations from working. Plaintiff has been totally and permanently disabled since July of 1990. Plaintiff's condition is permanent and that his prognosis is poor. Plaintiff will require future medical treatment for his condition, including intense psychiatric care.
16. Dr. Schmechel's diagnoses of Plaintiff are that he has a progressive chronic toxic encephalopathy and PTSD. Dr. Schmechel testified that the medical literature categorizes chronic toxic encephalopathy into three levels of severity. The first level, an organic affective syndrome, involves disturbances in mood with changes in personality and rage attacks, sleep disturbances, fatigue, difficulty in concentration and somatic complaints including headaches. The second level involves both affective difficulties and some neurological abnormalities as well. The most severe category involves affective and neurological damage, including balance or motor coordination difficulties, with a progressive course. Dr. Schmechel's opinion was that by June of 1992 the progression in Plaintiff's neurological difficulties established that he had a severe chronic encephalopathy.
17. In addition to his evaluation of Plaintiff, Dr. Schmechel has evaluated over twenty other patients who were once employed at CSI or affiliated companies performing similar operations. Plaintiff's symptoms are consistent with the symptoms Dr. Schmechel has found in these other patients, who share persistent symptoms of mood and personality disturbance. Dr. Schmechel stated that he had identified two other CSI employees, who like Plaintiff, have had progression of their symptoms after their work place exposure had ceased and who were extremely impaired by their problems.
18. Dr. Schmechel's opinion was, and the Full Commission finds as a fact, that Plaintiff's toxic encephalopathy was caused by his exposure to toxic chemicals at CSI. His opinion was based on Plaintiff's exposure history at work and the course of his symptoms. Plaintiff's work at CSI placed him at increased risk of developing toxic encephalopathy as compared to the public generally. Dr. Schmechel concluded that Plaintiff's exposure to glue fumes containing urea formaldehyde and solvents likely caused some further injury.
19. In Dr. Schmechel's opinion, Plaintiff's prognosis is poor, his condition is going to be extremely difficult to deal with medically, and he has a risk of further deterioration. He does not believe that Plaintiff can hold a job in the competitive economy because of his poor educational background, physical disability with gait and balance problems and, most significant, his episodic mood and rage disturbances that would prevent him from keeping a job. Dr. Schmechel believes that Plaintiff will require prolonged and possibly lifelong medical treatment for his symptoms.
20. Shortly after he lost his job at Davis, Plaintiff returned to Dr. Guerra complaining of severe headaches "like a sledge hammer hitting him in the head" and dizzy spells. In August of 1990 Plaintiff complained of behavioral outbursts and difficulty controlling his temper. In light of these symptoms, Dr. Guerra referred Plaintiff for evaluation and treatment to other physicians and professionals at the Duke University Medical Center, Bowman Gray Hospital and the Piedmont Treatment Center. In the years since, Plaintiff has been evaluated periodically by Dr. Donald Schmechel at the Memory Disorders Clinic at Duke University and has received regular treatment from Dr. Marc Guerra, Dr. Phillip Schmitt, a psychiatrist, and Dianne Sanford, a counselor at Piedmont Treatment Center.
21. Plaintiff continued working at CSI until December 15, 1985 when he was terminated. During the next year and one-half, he either worked in the furniture industry or was unemployed. On May 29, 1987 he began working for defendant Autumn House, a company which manufactured molded plywood for the furniture industry. Pieces of veneer would be run through a glue spreader and then placed in a dye or press which heated and pressed them to form plywood of a particular shape. The plywood product was then "machined" with saws, drills and other tools. Plaintiff was hired to work as a pump sander, but after a few weeks he was transferred to the trash detail because of problems with the quality of his work.
22. The plant produced a lot of wood scraps and plaintiff's job was to empty the trash boxes containing the scraps into the dump truck, and when it was full, take it to the landfill. He also swept floors and cleaned the bathrooms. Several times each day, he would go into the "glue room" where the plywood was made in order to get trash. The glue used by the plant contained a small amount of formaldehyde. However, the ventilation was good and formaldehyde levels were well below permitted levels.
23. On October 19, 1988 plaintiff was terminated by Autumn House for smoking marijuana on the premises. He then worked for short periods for Hamry's and Hardee's before being hired on May 9, 1989 to work at Davis Wood Products, which also manufactured molded plywood in a similar operation as Autumn House. He was hired as a press operator based upon his inaccurate representation that he had done that work for Autumn House, but he was unable to perform the job satisfactorily so he was transferred after four to five weeks to work in "clean up". This was a very similar job to the one he had performed at Autumn House. In "clean up" he visited the glue room three or four times a day. During the last three months of his employment at Davis Wood Products he worked continually in the glue room where he was constantly exposed to fumes from ureaformaldehyde glue. Except for the period of time he was out of work due to a hernia operation, he worked at Davis Wood Products until April 30, 1990 when he was terminated because he refused to accept a temporary work assignment at a different plant. He has not worked in any capacity since that date.
24. At Davis, Plaintiff was bothered by glue fumes when he worked as both a trash man and a glue spreader. Plaintiff noticed more problems with burning of his eyes and nose, headaches, lightheadedness and shortness of breath when he was around the glue fumes. He complained about these problems to Dennis Hoyle. The fumes were especially bothersome when he was a press operator. According to Plaintiff, "when you were mixing glue you got fumes. When you were feeding the glue spreader, you've got fumes. And when it's cooking you've got fumes." The fumes were "a real strong smell." During his time at Davis, in October of 1989 Plaintiff visited the Caldwell Memorial Hospital Emergency Room complaining of shortness of breath and anxiety.
25. On April 30, 1990, Plaintiff was fired from his job at Davis for refusing to transfer to work at another plant. By the time that he left Davis Wood Products, Plaintiff felt that some of the problems he had developed since his work at CSI had progressed further. These included his problems with anxiety and nervousness, irritability, mood swings, and balance. He has not worked in any capacity since April 30, 1990.
26. After leaving Davis, Plaintiff initially received unemployment benefits and then began receiving social security disability benefits effective from April 30, 1990. At his June 1992 hearing, Plaintiff described his constant headaches, being "upset a lot," and his becoming "very ill at the least little thing. I get mad." He has difficulty sleeping because he has "a lot of nightmares." As a result of his moods and rage, he has taken out his feelings on his girlfriend and has assaulted her. A neighbor, Dennis Hoyle, corroborated Plaintiff's testimony, stating that Plaintiff's problems with nerves, irritability and nausea have worsened. Mr. Hoyle described how Plaintiff will become nauseated and vomit during visits to his house. Plaintiff has balance problems so that he "staggers into things. It's hard to walk sometimes." On one occasion he was stopped by a deputy sheriff as he was walking to the doctor's office because the sheriff thought he had been drinking. His balance problems are worse than they were at Caldwell Systems. Plaintiff complained that heat especially makes him get dizzy and "pass out." On a typical day, Plaintiff testified that "when I am able to get up, I try to do a few things around the house like wash dishes, maybe hang up laundry, maybe vacuum but it's according to how I feel. Really, I can't do much because some mornings I feel like I can't get out of bed."
27. Dr. Guerra was of the opinion, and the Full Commission finds as a fact, that Plaintiff's work at Davis during his last three months of employment there, requiring him to work constantly around glue containing urea formaldehyde, aggravated his underlying condition. According to Dr. Guerra, Plaintiff is more sensitive to the adverse effects of any additional exposure to neurotoxin, and re-exposure will be "much more effective at aggravating the baseline neurologic problem." Formaldehyde has been shown to be neurotoxic, and Plaintiff's exposure at Davis increased his risk of aggravating the underlying problems.
28. Plaintiff's initial visit to the Piedmont Treatment Center, a mental health facility, was on October 2, 1990, when Dr. Guerra referred him to the clinic because of his chemical exposure. Therapist Dianne Sanford recommended weekly therapy sessions, and medication. On October 15, 1990, Dr. Phillip Schmitt, a psychiatrist, evaluated Plaintiff and noted a "depressed and somewhat irritable mood and affect." Dr. Schmitt's assessment was "probable mixed organic brain syndrome with possible aspects of an organic mood disorder as well as major depression."
29. During the following years, Plaintiff has received fairly regular counseling from Dianne Sanford and medication through Dr. Schmitt. During his course of treatment, he has continually complained of depression stemming from his physical disabilities, inability to play with his child or get outside and do things, and physical pain, including nausea and severe headaches. Treatment records reflect his complaints about daily nightmares involving violence and running from danger. They also note his repeated outbursts of violent behavior and disruptiveness. For example, on April 12, 1991, he became very angry and on the "verge of going off." On April 9, 1991 he was more depressed, more irritable and felt violence coming on more, and discussed with Ms. Sanford how to avoid this
30. Dr. Donald Schmechel evaluated Plaintiff on October 10, 1990 and June 18, 1992, upon referral from Dr. Guerra. Dr. Schmechel is an associate professor in medicine at the Duke University Medical Center and the associate director of the Alzheimer Disease Center at Duke. He is board certified in neurology and does research on neurodegenerative diseases. He sees patients clinically at the Veterans Administration Hospital and the Duke Memory Disorders Clinic. During his October 10, 1990 evaluation, Dr. Schmechel found Plaintiff to have an unsteady gait with some functionality, minor problems in recalling objects and in concentration, a depressed mood, and a poorly performed heel-to-shin maneuver. At that time Dr. Schmechel recommended counseling, anti-depressant medication and evaluation and follow up by a psychiatrist.
31. When Dr. Schmechel saw Plaintiff again in June 1992, he noticed a significant worsening of Plaintiff's symptoms since his original evaluation. In addition to previous symptoms Plaintiff had reported, he now described spells of falling out, and he and his girlfriend both stated that his mood disturbance was worse. On neurological examination, Dr. Schmechel found several objective abnormalities including an unsteady gait, as well as a depressed mood and affect. He felt that Plaintiff's neurological exam had gone from "quasi-normal to abnormal." There were no signs of functionality or malingering.
32. Dr. Jonathan Davidson evaluated Plaintiff's psychiatric condition on August 14, 1992. Dr. Davidson is an associate professor of psychiatry at Duke University and director of the Anxiety and Traumatic Distress Program at Duke. He is board certified in psychiatry and has specialized in the areas of depression, anxiety and traumatic stress. He has researched and written extensively on the subject of post-traumatic stress and is co-chair of the American Psychiatric Association's task force on PTSD for DSM-IV. Dr. Davidson found the styrene spill at CSI to be the most significant part of Plaintiff's history. During his interview, Plaintiff described how the styrene on his skin made him burn "like frying to the bone" and how the experience was "one of panic, being unable to breathe, fighting for air, he saw his life passing in front of him, `thought it was my time.' He truly thought he was dying." Plaintiff described changes in his mood and behavior since the spill, and his father confirmed these changes. He showed no signs of exaggeration or untruthfulness during the interview.
33. Dr. Davidson diagnosed Plaintiff as having chronic post-traumatic stress disorder. This diagnosis is not disputed by any other medical expert and is consistent with the 1987 diagnosis from NCMH and the views of Dr. Schmechel. Post-traumatic stress disorder is a psychiatric disorder that develops after a person experiences a life threatening event outside of the normal experience which would be profoundly distressing to almost anyone. PTSD is characterized by intrusive symptoms in which the person re-experiences the event, avoids things that remind the person of the experience, withdraws from contact with other people, and is hypervigilant, or has a startle response. The onset of PTSD can be from six months to thirty years after the trauma. Dr. Davidson believes that Plaintiff's PTSD was caused by his work at CSI, specifically by the styrene spill, which was a sufficiently traumatic stressor to produce the disorder. Dr. Davidson's opinion also is that Plaintiff's work at CSI placed him at increased risk of contracting PTSD over members of the general public: "The risk would be greater for any person who was more likely to encounter life-threatening events. And because of his working there — because of his job with Caldwell Systems, that seems to be the case." The hazardous nature of the chemicals in which Plaintiff worked, the near total lack of safety measures at the facility, and the frequency with which Plaintiff experienced exposure all are factors that would increase his risk of developing PTSD when compared to members of the general public.
34. During the evaluation, Dr. Davidson noted that Plaintiff had had other stressors in his life, including the death of his mother and "exposure to glue fumes when he worked at Davis between 1990 and 1991." Dr. Davidson testified that Plaintiff's work at Davis would have exacerbated [the PTSD] and serv[ed] again as reminders — exposure to reminders of the trauma." He agreed that the exposure at Davis could have "provided further injury of that underlying process of his disorder." Plaintiff's frequent exposure to glue at Davis put him at an increased risk relative to members of the general public of augmentation of the PTSD.
35. Dr. Davidson's opinion is that there is only a small chance that Plaintiff will ever recover from his PTSD. Plaintiff has had PTSD for several years, and the longer he has it the more difficult it is for him to get better. Plaintiff will require ongoing medical treatment for his PTSD, including medication to help reduce the symptoms and counseling to help deal with both the event itself and how it has affected his life. Because of his PTSD, Dr. Davidson's opinion is that Plaintiff is severely limited in the kind of work he might be able to do.
36. Defendant CSI had Plaintiff examined by Dr. Mitchell Freedman, a neurologist in private practice in Raleigh who saw Plaintiff on only one occasion. Dr. Freedman is not an occupational medicine specialist, has very little experience evaluating patients with occupational chemical exposures, and has little familiarity with the medical literature concerning health effects of organic solvents and hazardous waste. He is not an expert in psychiatry and did not attempt to perform a psychiatric evaluation of Plaintiff. Dr. Freedman evaluated Plaintiff in April of 1991. Dr. Freedman found no sign of functionality or malingering in his evaluation.
37. Defendants Davis Wood Products and Reliance Insurance Company offered the testimony of Dr. Peter D'Onofrio, a board certified neurologist in the Department of Neurology at Bowman Gray Hospital. Dr. D'Onofrio's clinical practice focuses on general neurology and patients with neuromuscular conditions. His research has focused on electriphysiologic studies. He is not an occupational medicine specialist nor a psychiatrist, and only two to three percent of his patients assert work-related toxic exposure. Dr. D'Onofno briefly examined Glenn Ray Taylor on September 12, 1990 as part of a study conducted by the National Institute of Occupational Safety and Health ("NIOSH") of the federal government. This study consisted of evaluations of two groups of subjects, all of whom had worked at CSI or sister companies. The study's purpose was to try to establish a "case definition for an epidemiologic study" of the reported neurologic disorders of CSI workers. All the patients, including Plaintiff, underwent a questionnaire, a general medical exam, a psychiatric evaluation, and two independent neurological exams performed by Dr. D'Onofrio and another neurologist.
38. In his examination of Plaintiff during the NIOSH study, Dr. D'Onofrio did not conduct a mental status examination and was aware only of the findings of the other neurologist's very brief mental status assessment. Both neurologists found that Plaintiff's neurologic examination was essentially normal. Dr. D'Onofrio's assessment at that time was that Plaintiff did not have a toxic encephalopathy, but he admits that his evaluations were made without any knowledge of Plaintiff's psychiatric examination, prior medical history, specific work place exposures, history of acute symptoms at work, and without the benefit of being able to perform any follow-up testing to rule out other conditions. Dr. D'Onofrio agreed that he could not make any conclusive diagnosis based on such limited information.
39. As a result of his compensable occupational diseases, the fact that he is likely never to recover, his limited education and limited job skills, Defendant has not been able to find employment since April 30, 1990 and is likely never to be able to find gainful employment because of such disabilities and limited job skills.
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
CONCLUSIONS OF LAW
1. Plaintiff is disabled from occupational diseases (chronic toxic encephalopathy and post traumatic stress disorder) proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment. Such employment subjected him to an increased risk of developing chronic toxic encophalopathy and post traumatic stress disorder than members of the general public. N.C.G.S. § 97-53 (13). These diseases were caused by exposure to chemicals and chemical fumes at Caldwell Systems, Inc. Compensation is payable for these occupational diseases.
2. Plaintiff was last injuriously exposed to the hazards of such diseases while an employee of Defendant Davis Wood Products and during the last three months of such employment, i.e., February, March and April of 1990, when Plaintiff worked in the glue room and was constantly exposed to glue fumes. Defendant Davis Wood Products was self insured during that period of time.
3. Plaintiff does not have to establish that the conditions of his employment with the defendant caused or significantly contributed to his disease. He need only shown that: (1) he has an occupational disease and (2) he was "last injuriously exposed to the hazards of such disease" in the defendant's employment.Barber v Babcock Wilcox Constr. Co., 101 N.C. App. 564,400 S.E.2d 735 (1991). Section 97-57 of the Workers' Compensation Act states that when a worker has an occupational disease, the employer in whose employment the worker was "last injuriously exposed to the hazards of such disease" and any carrier on the risk at that time shall be liable for the occupational disease. This section of the Act does not require the claimant to show that the last exposure caused or significantly contributed to the disease, or even substantially worsened his condition. "Last injurious exposure" means no more than "an exposure which proximately augmented the disease to any extent, however slight." Haynes v. FeldsparProducts Co., 222 N.C. 163, 166 22 S.E.2d 275, 277 (1942); Caulderv. Mills, 314 N.C. 70, 73, 331 S.E.2d 646, 648 (1985). Exposure to a substance can constitute a last injurious exposure even if the substance itself is incapable of causing the occupational disease. Caulder, 314 N.C. at 74, 331 S.E.2d at 649.
4. The plaintiff is totally disabled, based on the uncontradicted evidence concerning the extent and severity of his conditions. Plaintiff is totally disabled from working at Davis Wood Products or any other employment because of both his PTSD and his chronic toxic encephalopathy. Even before his problems with these conditions, Plaintiff was very limited in the jobs that he could perform. He is unable to read anything but simple words, cannot read a ruler, did not graduate from high school and has not obtained a GED. The jobs that he held before working at CSI reflect that he has not performed skilled work and could mainly perform manual labor. His previous experience included building boxes, tailing saws, mowing grass and working as a fast food cook. As a result of his progressive post-traumatic stress disorder and toxic encephalopathy, Plaintiff's limited capacities are now even more limited. Plaintiff's work history after CSI reflects his progressive deterioration: at Hamry's in around 1986 he could no longer keep up with work tailing saws and had to quit his job; at Autumn House in 1987 he could not pump sand properly, even though he had done that work before; and at Davis in 1990 he could not properly feed veneer sheets as a glue spreader. The most he could do at his last two jobs was work as a trash man. By summer of 1990 he was unable to work at all. The medical testimony is to the effect, and we so find and conclude, that there is no liklihood that he will ever recover from these conditions. Plaintiff is thus entitled to receive compensation for the remainder of his life or until Defendant Davis Wood Products obtains permission from the Industrial Commission to cease payment of total and permanent disability compensation, whichever first occurs. N.C.G.S. § 97-29.
5. Defendant Davis Wood Products, both as employer and as self-insurer, is liable for the disability by occupational disease of plaintiff and as such is liable to pay disability compensation and the cost of medical treatment necessary to effect a cure or give relief.
6. Plaintiff's average weekly wage while working at Davis Wood Products as calculated from the stipulated Form 22 was $194.60 per week, yielding a compensation rate of $129.74.
7. To encourage employers to obey health and safety laws, the North Carolina Workers' Compensation Act provides that compensation shall be increased by ten percent "when the injury or death is caused by the willful failure of the employer to comply with any statutory requirement." We conclude that the injury in the case before us was caused by the willful failure of Caldwell Systems, Inc., to comply with N.C.G.S. § 95-129 (2) which requires employers to comply with occupational safety and health standards or regulations promulgated pursuant to the Occupational Safety and Health Act of North Carolina (OSHANC). The State OSHA incorporates the Federal OSHA. The violations pertinent to Plaintiff's condition include 29 C.F.R. § 1910.132 (c), regarding the failure to provide gloves designed to protect against all of the hazardous wastes being handled. Also significant was the violation of 29 C.F.R. § 1910.134 (b) (2) regarding selection of respirators and § 1910.134 (b) (6), regarding clean storage of respirators. These particular cited violations are specific instances of the more general violation of OSHA's requirement that personal protective equipment be provided "wherever it is necessary by reason of hazards of processes or environment, chemical hazards . . . encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact" and that "all personal protective equipment shall be of safe design and construction for the work to be performed." 29 C.F.R. § 1910.132. Throughout this record, there is evidence of the employer's failure to supply appropriate protective equipment. The chronic occurrence of acute illness, including nausea, headaches, rashes and other illnesses make plain that the employer was not providing adequate protective equipment. Indeed, Mr. Byers, who had responsibility for ordering the protective equipment, knew that suits were readily permeable, and that employees, including Plaintiff, were acutely ill on a regular basis despite using the equipment provided. Obviously, had adequate protective equipment been provided, Plaintiff would not have experienced harmful exposures and therefore would not have acquired the chronic toxic encephalopathy and other conditions he now suffers. This evidence also suffices to establish that the violations were "willful" within the meaning of N.C. Gen. Stat. § 97-12. Where conditions were so hazardous, and where supervision knew of the ill effects being experienced by employees, as Mr. Byers' testimony demonstrates, the employer's failure to supply adequate protective equipment clearly manifests a "deliberate purpose not to discharge" its safety obligations. See, in contrast, Prevette v. Clark EquipmentCo., 302 S.E.2d 639, 642 (N.C.App. 1983) (where employer made adequate equipment available and instructed employees how to use it, OSHA violation not "willful.").
8. Ordinarily, the ten percent penalty is imposed on the employer responsible to pay compensation. Here, the violations of N.C. Gen. Stat. § 97-12 were committed by Caldwell Systems, which was the employer which initially caused Plaintiff's condition. Although he later had injurious exposure to the hazards of his occupational diseases, the penalty should still be imposed on Caldwell Systems, which should be obligated to pay an additional ten percent of the compensation owed to him.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of Deputy Commissioner Chapman and enters the following:
AWARD
1. Defendant Davis Wood Products, as employer and self-insured, shall pay plaintiff, on account of his permanent total disability, compensation at a rate of $129.74 per week from May 1, 1990 and thereafter continuing at the same rate for the remainder of his natural life or until Defendant Davis Wood Products obtains permission from the Industrial Commission to cease payment of total and permanent disability compensation, whichever first occurs. N.C.G.S. § 97-29. Such compensation as has accrued hereunder shall be paid in a lump sum, without commutation, subject to a reasonable attorney fee hereinafter approved. Defendant shall pay interest on such accrued compensation from 24 June 1992 (the first date of the hearing below) until paid. All of the interest is payable to the Plaintiff.
2. A reasonable attorney fee in the amount of twenty-five (25) percent of the accrued compensation benefits due under the above award is hereby approved for plaintiff's counsel, which shall be deducted from the same award and forwarded directly to the attorney. For the balance of his fee defendant shall forward every fourth compensation check payable hereunder directly to plaintiff's counsel.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated with plaintiff's disabling conditions, defendant shall pay all reasonable and necessary medical expenses incurred as a result of Plaintiff's occupational diseases when bills for the same are submitted in accordance with the Industrial Commission Rules.
4. Defendant Davis Wood Products shall bear the costs, including as part thereof, the expert witness fees previously awarded to the extent they have not already been paid.
5. Defendant Caldwell Systems, Inc., and its carrier, Liberty Mutual Insurance Company, shall pay to the plaintiff a penalty equal to 10% of the compensation awarded. The 10% penalty on such compensation as has accrued shall be paid within 30 days from the date of this Opinion and Award in a lump sum, without commutation. Thereafter, the penalty shall be paid to plaintiff weekly as long as compensation payments continue to be paid or due.
 S/ ________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ________________ COY M. VANCE COMMISSIONER