# 𝔎𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## Pocahontas Fuel Company, Inc. v. John M. Godbey.

October 8, 1951.

Record No. 3861.

Present, All the Justices.

The opinion states the case.

*Bowen & Gillespie,* for the appellant.

*David T. Kennedy* and *Townsend & Townsend,* for the appellee.

MILLER, J., delivered the opinion of the court.

This appeal presents for review an award of the Industrial Commission of Virginia against Pocahontas Fuel Company, Inc., appellant, which granted to John M. Godbey, appellee, compensation for partial disability due to silicosis.

The award carried into effect the majority opinion of the Commission to which one Commissioner dissented.[1]

It is conceded that appellee was suffering from silicosis and was partially disabled when he ceased working for the company, but appellant denies that it is liable to him.

Appellant asserts:

(1) That appellee's occupational disease did not arise out of and in the course of his employment as required by section 65-42, Code of Virginia, 1950. In this connection appellant insists that the evidence does not show that he was "injuriously exposed to the hazards of the disease" while in its employ, and thus his silicosis and disability have no causal connection with his employment by appellant;

(2) That appellee failed to give written notice of his occupational disease to appellant as required by section 65-48, Code of Virginia, 1950.

The evidence disclosed that since sometime in the year 1915 appellee had worked continuously in coal mines for several employers until he became partially disabled while in appellant's employ and was forced to cease work on September 10, 1948.

Throughout these thirty-three years of employment his work had been principally that of loading coal except for a period of about two years, i. e., 1929 to 1931, when he operated a coal-cutting machine for the Pocahontas Corporation. His last and only employment by appellant was from June 21, 1946, to September 10, 1948. During these twenty-seven months appellee was en-

---

[1]Commissioner Nuckols delivered the majority opinion, and Commissioner Nickels wrote the dissent.

gaged in loading coal four hundred and seventy-four days and in doing other work in the mine eighteen days.

It does not appear that any dust count was made in the mine during the time that appellee was employed by appellant, and thus the percentage of free silica present is undetermined. However, it is shown from appellee's testimony and that of two other witnesses that throughout this period of slightly more than two years he was often exposed to sand dust of considerable concentration and density. He describes his exposure thus:

"Q. During the period from June, 1946, until September, 1948, when you quit, did you come in contact with any dust working in that mine?

"A. I believe I done it.

"Q. What kind of dust?

"A. Sand dust."

  * * * * * * * *

"Q. Any dust you could notice?

"A. Yes, sir."

Witness D. C. Slagle worked with appellee for about five or six months. Two months of his employment were in 1946 and the other three or four months were not long prior to the date appellee ceased work. He described the sand dust that obtained at times and the condition under which they worked as follows:

"Q. How heavy was the dust?

"A. You couldn't hardly see across the cars."

The material parts of the testimony of Doc Greear, the other witness who worked with appellee in the mine, follows:

"Q. How dusty is it out there to you?

"A. Sometime it is pretty dusty."

  * * * * * * * *

"Q. Did you come in contact with dust?

"A. Yes, sir.

"Q. Will you tell us how and where you did come in contact with dust?

"A. I didn't come into as much dust as he did. He was janitor. What he did was load a car of sand and rock and go up a half mile and load a car of coal.

"Q. What kind of dust is it?

"A. Sand dust and rock dust."

  * * * * * * * *

"Q. Could you see the dust in the air?

"A. Couldn't even see your buddy hardly.

"Q. What kind of rock is in that mine?

"A. Sandstone and draw rock. It was all dust."

The evidence further discloses that when appellee entered appellant's employ, he was given a medical examination, and he was at that date apparently in good health and had experienced no known ill effects from his work.

In June, 1948, appellee began to cough and felt some weakness and shortness of breath. These symptoms were not then so pronounced as to cause him to cease work, but did prompt him to secure and X-ray examination by the mobile unit. The result of that X-ray is not disclosed by the record, but early in September, 1948, he called upon Dr. Sproles, the physician who made physical examinations of the company's employees. Upon examination by that physician, he was advised to report to Bluefield Sanitarium, and he was X-rayed at that institution on September 13, 1948. This X-ray actually disclosed some evidence of silicosis and also the possibility of tuberculosis. Appellee was not made aware of the fact that he might be suffering from silicosis, but was merely told that his trouble was tuberculosis and was sent to Pinecrest Sanatorium, Beckley, West Virginia, for treatment for that disease.

He entered that institution on November 8, 1948, and remained there until January 5, 1949. During that period additional examinations and X-rays were made to determine just what was appellee's condition, and upon his discharge on January 5, 1949, he was for the first time advised that a diagnosis of silicosis had been made, and that he was suffering from that disease.

On January 13, 1949, appellee called again upon Dr. Sproles, who was still acting as medical examiner for appellant. His remuneration is paid by the employees through appellant by means of a check-off withheld from their pay. However, he is furnished a home by appellant and required to examine its employees and pass upon and report to the company upon their physical fitness and ability to work. In short, he acts as the company's physician for examination of prospective and actual employees as well as to report upon the physical fitness of any employee who has been off duty because of sickness or injury.

The visit made by appellee to the physician was for the purpose of having him fill out "an insurance blank" needed by appellee to obtain disability payments on a group insurance policy

in which he was a beneficiary. On that date he presented to Dr. Sproles a statement from Pinecrest Sanatorium which disclosed that he was suffering from silicosis. The statement was examined by the physician and returned to him, and the "insurance blank" filled out.

On April 22, 1949, appellee was X-rayed at the Raleigh General Hospital, Beckley, West Virginia, and found to be then suffering with second-stage silicosis. His final examination and X-ray were made at Bluefield Sanitarium, Bluefield, West Virginia, on June 13, 1949, by Drs. R. C. Neale, H. F. Warden, Jr., and S. G. Davidson, the latter of whom X-rayed the patient and presented a written report upon his condition. This examination appears to have been thorough and exhaustive, and it was found that the disease had progressed to the late second stage. The conclusion of these physicians is stated thus by Dr. Davidson who signed the report:

"This man has a late second stage silicosis with definite decreased capacity to do work as indicated by his exercise tolerance test. It is our opinion that he had a 20% disability at the time he quit work Sept., 1948, due to the disease silicosis. His symptoms have increased since that time. It is my opinion that the disease has been present for a long time and that his most hazardous exposure occurred while running a cutting machine from 1929 to 1931. I am sure that he did not develop the disease while working for his last employer the Poca Fuel Co. between 1946 to September, 1948, but it is quite possible that he received enough exposure to silicon dioxide dust to have exaggerated a pre-existing silicosis."

The development and progress of silicosis are known to be imperceptible, insidious and slow. Under usual conditions it takes years to develop to a stage where it is incapacitating.

"Nearly always the course is exceedingly slow. Onset, even with gritstone and quartzite, does not occur for from five to ten years; with hard rock miners, in South Africa, from 6.8 to 8.8 years; in ganister and granite from ten to twenty years; and in pottery workers over twenty years. The average time before symptoms develop is from ten to fifteen years; American experience is about fifteen." *Attorney's Textbook of Medicine* by Roscoe N. Gray, M.D., at page 178.

The disease is divided by medical authorities into three stages, each being evidenced by somewhat different symptoms as

the progress of the malady develops.  See *Pocahontas Corp.* v. *Richardson*, 186 Va. 367, 42 S. E. (2d) 260, and authorities and treatises cited.

Appellant contends, (1) that Dr. Davidson's report establishes only a possibility—certainly nothing more than a mere probability that appellee was injuriously affected by his employment with appellant, and (2) that there is no other evidence of probative value to be considered along with the report that justifies the conclusion that there was causal connection between his employment in appellant's mine and his disease.

With the first of these contentions we can agree, but to the second we cannot give our assent.

Though it appears from Dr. Davidson's report and other evidence in the record that appellee had silicosis when employed by appellant, yet the malady did not reach an incapacitating stage until during the year 1948.  It is quite likely that his ultimate disability was caused by his exposure to the hazards of the disease in varying degrees while in the employ of more than one of the employers for whom he worked as a miner throughout his long service of thirty-three years.

The material parts of section 65-42, Code of Virginia, 1950, read as follows:

"As used in this Act, unless the context clearly indicates otherwise, the term 'occupational disease' means a disease arising out of and in the course of the employment. * * * A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

"(1)  a direct causal connection between the conditions under which work is performed and the occupational disease,

"(2)  it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,

"(3)  it can be fairly traced to the employment as the proximate cause,

"(4)  it does not come from a hazard to which workmen would have been equally exposed outside of the employment,

"(5)  it is incidental to the character of the business and not independent of the relation of employer and employee, and

"(6)  it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as

a natural consequence, though it need not have been foreseen or expected before its contraction.''

We think the word "employment" as used in this section was correctly defined and properly applied to the facts of this case. In the majority opinion of the Commission it is said:

"The word 'employment' as used in the foregoing statute is not used as it is elsewhere in the Act to describe the relation between employer and employee. In this statute the word refers to the work or process in which the employee has been engaged and not to his contract with an employer to engage in it. *Blatchford* v. *Staddon & Founds,* Law Reports, 1927, Appeal Cases, p. 461; *Pacific Indem. Co.* v. *Industrial Acci. Comm.,* 86 Cal. App. (2d) 726, 195 P. (2d) 919, 920; *Anderson* v. *Roberts-Karp Hotel Co.,* 171 Minn. 402, 214 N. W. 265; *State* v. *Foster,* 37 Iowa 404, 407; *White* v. *Rio Grande Western Ry. Co.,* 25 Utah 346, 71 P. 593, 594; *Elm Springs Canning Co.* v. *Sullins,* 207 Ark. 257, 180 S. W. (2d) 113, 115; *State* v. *Birmingham Beauty Shop,* 240 Ala. 170, 198 So. 435, 436.

"Where there is a direct causal connection between the employee's several employments and his disability resulting from silicosis, so that the occupational disease is in effect a single injury caused in part at least by injuries incurred in employment of the several employers, the occupational disease is compensable as 'arising out of and in the course of employment'. *Niedzwicki* v. *Pequonnock Foundry,* 133 Conn. 78, 48 A. (2d) 369. The fact that the disease did not originate during the claimant's employment with the defendant will not operate to relieve the defendant of liability.''

With that we agree.

Though an employee suffering from an occupational disease may have contracted it while in the employ of some other employer, or once contracted, the disease may have been augmented and aggravated while in the successive employ of several employers, yet section 65-47, Code of Virginia, 1950, restricts and limits his right of action to one employer and its insurance carrier. It reads:

"When an employee has an occupational disease that is covered by this Act, the employer in whose employment he was last injuriously exposed to the hazards of the disease and the employer's insurance carrier, if any, at the time of the exposure, shall alone be liable therefor, without right to contribution from any prior employer or insurance carrier.''

█ It is thus seen that section 65-42 requires that an employee establish that his occupational disease arose "out of and in the course of his employment," yet he is not required to prove that its incipiency took place or that it originated while he was working for the employer who is made liable to him. This is true because section 65-47 expressly limits his right of action to the employer in whose employment he was last injuriously exposed to the hazards of the disease. He is not required to prove that his occupational disease was contracted while he was working for any particular employer, but merely to establish by a fair preponderance of evidence in whose employ he was last injuriously exposed. *Bye* v. *Interstate Granite Co.*, 230 N. C. 334, 53 S. E. (2d) 274, and *Textileather Corp.* v. *Great American Indem. Co.*, 108 N. J. L. 121, 156 A. 840.

It is immaterial that he may have been in the employ of another or others at the incipiency of or during the slow and insidious progress of the malady. The statute expressly holds liable the employer in whose employ he was when last injuriously exposed to its hazards, irrespective of when or in whose employ he was when the disease was first contracted. And the phrase "last injuriously exposed," as used in the statute, means an exposure or contact with the dangers of the disease which proximately causes the malady, or augments or aggravates the pre-existing disease. *Haynes* v. *Feldspar Producing Co.*, 222 N. C. 163, 22 S. E. (2d) 275; *Bye* v. *Interstate Granite Co.*, *supra*. Sand dust in concentrated quantities is recognized as a cause or source of this occupational disease.

█ Standing alone, Dr. Davidson's report would be insufficient to establish that appellee had been injuriously exposed to the hazards of the disease while in appellant's employ. But when this report was formulated, the physicians did not have the benefit of the testimony of witnesses Slagle and Greear concerning the conditions under which appellee worked. Their testimony descriptive of the sand dust concentration which prevailed at times where appellee worked we consider of probative value. When Dr. Davidson's report is considered along with this evidence and all the other pertinent circumstances of the case, we deem the sum total sufficient to sustain the factual findings of the Commission. When its factual findings are supported by credible evidence, whether that evidence be conflicting or not, it may not be disturbed by us. *Holt* v. *Stone, etc., Engineering Corp.*, 179

Va. 625, 20 S. E. (2d) 498; *Byrd* v. *Stonega Coke, etc., Co.,* 182 Va. 212, 28 S. E. (2d) 725; *Kelly* v. *Pendleton Const. Co.,* 182 Va. 191, 28 S. E. (2d) 621; *Humphries* v. *Newport News Shipbuilding, etc., Co.,* 183 Va. 466, 32 S. E. (2d) 689; *American Motorists Ins. Co.* v. *Summers,* 183 Va. 428, 32 S. E. (2d) 673; *Hopson* v. *Hungerford Coal Co.,* 187 Va. 299, 46 S. E. (2d) 392.

Section 65-48, Code of Virginia, 1950, fixes the time within which a claimant suffering from an occupational disease shall give notice thereof to his employer. It follows:

"Within thirty days after claimant first experiences a distinct manifestation, or a diagnosis is made, whichever shall first occur, of an occupational disease, the employee, or someone on his behalf, shall give written notice thereof to the employer in accordance with sections 65-82 and 65-83."

The written notice required was not given by appellee. However, it is shown that Dr. Sproles, whom appellee contends was appellant's agent and representative, was fully aware of the fact that he was suffering from silicosis within thirty days from the time that he first experienced a distinct manifestation, or a diagnosis was made of the disease. Reliance is then had upon the saving provisions contained in section 65-82, Code of Virginia, 1950, which relieve a claimant from the necessity of giving the written notice under certain conditions, and he says that the facts proved bring him within the protective terms of that section.[1] In this connection it should also be said that by section 65-46, Code of Virginia, 1950, the saving provisions of section 65-82 relative to when written notice need not be given when accidental injury is suffered are made applicable to occupational diseases.

Appellee's contentions are, we think, legally sound and sustained by the evidence.

By the terms of the statute the claimant is relieved of the

[1]"Every injured employee or his representative shall immediately on the occurrence of an accident or as soon thereafter as practicable give or cause to be given to the employer a written notice of the accident, and the employee shall not be entitled to physician's fees nor to any compensation which may have accrued under the terms of this Act prior to the giving of such notice, unless it can be shown that the employer, his agent or representative, had knowledge of the accident or that the party required to give such notice had been prevented from doing so by reason of physical or mental incapacity or the fraud or deceit of some third party. But no compensation shall be payable unless such written notice is given within thirty days after the occurrence of the accident or death, unless reasonable excuse is made to the satisfaction of the Industrial Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby."

necessity to give written notice when it is proved than an agent or representative of the employer had knowledge of the accident (occupational disease), and the Commission is satisfied that the employer has not been prejudiced by the failure to give written notice. *Department of Game, etc.* v. *Joyce,* 147 Va. 89, 136 S. E. 651.

■ It is definitely shown that Dr. Sproles was, on January 13, 1949, made aware of the fact that appellee was suffering from silicosis. And, in our opinion, the facts and circumstances in evidence bearing upon his position, relation with and services to appellant justified the conclusion that he was the corporation's agent and representative. Nor does it appear that appellant was prejudiced in any manner by failure to receive the written notice provided by the statute.

■ The evidence also, in our opinion, was sufficient to establish that when Dr. Sproles first had actual knowledge of appellee's condition on January 13, 1949, thirty days had not elapsed from the time that appellee first experienced a distinct manifestation or a diagnosis was made of his disease. That a workman may have contracted the disease a long time previous to its diagnosis as silicosis, and yet experienced no distinct manifestation thereof, is borne out by the evidence in this case, and that such may be true is well recognized.

In *Pocahontas Corp.* v. *Richardson, supra,* we find the following: "The disease may have developed to such an extent that it is susceptible of diagnosis by an experienced doctor with the aid of x-ray and yet the objective symptoms may be so slight that the victim may be entirely unconscious of having contracted the disease." (186 Va. 371).

When appellee entered the corporation's employ in 1946, he was examined and found to be apparently in good health. In the summer of 1948, when he was X-rayed by the mobile unit, though he was instructed to report to a physician and was then experiencing some weakness and shortness of breath, it does not appear that there were then found any pronounced symptoms of silicosis. On the contrary, he was during the fall of that year treated for tuberculosis, and though repeated examinations and X-rays were made, it is not shown that any physician concluded that he had silicosis until on or about January 5, 1949. Certainly, until about that time no diagnosis of silicosis had been made nor had appellee been informed that he was suffering from that

disease. Under these facts, the Commission could reasonably find that he had not experienced a distinct manifestation of the disease more than thirty days previous to January 13, 1949, when Dr. Sproles was fully apprised of his condition.

We find no error in the award of the Industrial Commission, and it is

*Affirmed.*