COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Malveaux and Senior Judge Frank
Argued at Newport News, Virginia


CITY OF NORFOLK

                                                    MEMORANDUM OPINION BY*
v.        Record No. 1058-17-1                 JUDGE MARY BENNETT MALVEAUX
                                                         JANUARY 9, 2018
ROYCE MUNKER


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Heather A. Mullen, Deputy City Attorney (Office of the City
        Attorney, on brief), for appellant.

        Adam B. Shall (TaylorWalker P.C., on brief), for appellee.


        The City of Norfolk ("employer") appeals a decision of the Workers' Compensation

Commission ("the Commission") awarding benefits to Royce Munker ("claimant"). On appeal,

employer argues the Commission erred in finding that claimant's post-traumatic stress disorder

("PTSD") is an occupational disease under Code § 65.2-400.[1] For the following reasons, we

reverse and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

        "On appeal from a decision of the Workers' Compensation Commission, the evidence

and all reasonable inferences that may be drawn from that evidence are viewed in the light most

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Employer also assigns error to the Commission's finding that claimant "had met his
burden of proving he suffered from the occupational disease of PTSD." We find that this
assignment of error, discussing the burden of proof necessary to find that an employee suffers
from an occupational disease, is merely a part of employer's overall argument that the
Commission erred in finding that claimant's PTSD is an occupational disease. Therefore, we
address this issue as part of employer's first assignment of error.

favorable to the party prevailing below." Artis v. Ottenberg's Bakers, Inc., 45 Va. App. 72, 83, 608 S.E.2d 512, 517 (2005) (*en banc*).

### Employment History

In February 2015, claimant was employed by employer's Department of Fire-Rescue. He had worked for employer for eighteen years. On February 3, he was working as a fire inspector, and had held this position for the previous year. In this role, he would inspect buildings and investigate fires.

Prior to holding that position, claimant worked for employer as a firefighter paramedic, responding to calls for fire and medical emergencies.[2] During his seventeen years working as a firefighter paramedic, claimant responded to "a lot of bad calls." Claimant witnessed decomposing bodies and shooting victims with "blood everywhere," picked up body parts, and experienced smells that made him nauseous. On one call, an individual pulled a knife on him. Claimant went into fires and "smell[ed] and s[aw] charred bodies and ha[d] to deal with that, babies, adults, animals."

Twice during his time working for employer, claimant participated in post-Hurricane Katrina relief efforts. On the first relief trip, claimant "went down . . . with one individual" and was not part of "an actual team." On his second relief trip, he was part of a federal Disaster Medical Assistance Team ("DMAT"). Employer allowed, but did not require, its employees to participate in relief efforts as part of a DMAT. While with the DMAT, claimant worked for and was paid by the federal government, not employer. During both trips, claimant testified that he performed "EMS . . . [p]aramedic work."

---

[2] Claimant testified that he was first hired in a "firefighter shock trauma" position, and later advanced to the firefighter paramedic role. He testified that both positions involved responding to emergency calls.

While assisting in post-Hurricane Katrina relief efforts, claimant saw coffins floating in the water. He was also threatened by a looter with a gun.

<u>Change in Position and Medical Evidence</u>

On February 3, 2015, claimant was told that he would be reassigned to his previous position as a firefighter paramedic. Upon hearing this, claimant became "real sweaty, nervous, felt very sick to [his] stomach . . . [j]ust very emotional and . . . started relating bad calls that [he] had been on." Claimant went to Patient First in Virginia Beach that day, and reported increased stress and anxiety related to his work over the previous six months. After visiting Patient First, claimant sought treatment from Lynette Widgeon-Hammonds and Dr. Amanda Rhodes.

On March 16, 2015, claimant saw Widgeon-Hammonds, a licensed clinical social worker. Widgeon-Hammonds' notes from this visit indicate "[p]ost-trauma stress" from "numerous incidents during the past 18+ years of paramedic duty," including "unexpected situations where he as a paramedic was a victim of threat while trying to save a life (knives pulled on him; a gun pointed at him by a gang member who wanted victim dead)."

Claimant again saw Widgeon-Hammonds on April 2 and April 30, 2015, reporting anxiety, panic attacks, and nightmares. He returned to her on May 7, 2015, and during that visit told her that he was a Hurricane Katrina first responder and was "almost robbed while on duty" by men with guns. He also stated that he had a "hard time transitioning once he came home," as he would see "those events"—"carcasses floating and smells." During a June 3, 2015 visit he reported avoiding crowds. On June 17, claimant reported to Widgeon-Hammonds that he had a panic attack in his surgeon's office because he had a flashback to when he had to "put tubes down people's throats." On July 8, claimant reported that he was avoiding going into Norfolk.

During several visits with Widgeon-Hammonds, claimant also discussed family traumas, including traumatic childhood experiences.

Widgeon-Hammonds diagnosed claimant with PTSD. She testified that the events she discussed with claimant which led to the PTSD diagnosis included unexpected situations he experienced in his firefighter paramedic position. These included having a "gun pulled on him," seeing deformed bodies, and delivering a twelve-year-old's baby. Another event that contributed to the diagnosis was claimant's experience of having a looter point a gun at him while he was assisting in post-Katrina relief efforts. Widgeon-Hammonds testified that she first diagnosed claimant with PTSD on May 7, 2015, "because that's when he talked about a lot of the specifics, Hurricane Katrina and that kind of thing." She opined that the various situations that she referenced—which occurred during claimant's time as a paramedic in Norfolk and his experience as a first responder after Katrina—"cumulatively led" to her PTSD diagnosis. Widgeon-Hammonds also opined that claimant's "cumulative traumas throughout the course of his career as a fire and rescue worker . . . proximately caused" his PTSD and that his PTSD was the result of "exposure to those incidents . . . relating to the nature of [claimant's] employment as a firefighter." She further opined that claimant's experiences during his employment resulted in his PTSD, rather than his PTSD arising from family or any other non-work-related causes. Widgeon-Hammonds opined that the "triggering event" for claimant's PTSD was his reassignment as a firefighter paramedic, because "the idea of going back into a threatening situation such as that was something overwhelming to his brain."

On February 16, 2015, claimant visited Dr. Amanda Rhodes, a psychiatrist, and reported that he had a panic attack after learning that he was being reassigned at work. He stated that he had lost fourteen pounds in one week and experienced recurrent panic and nightmares. He continued to see Dr. Rhodes to help manage his symptoms with medication.

On February 23, 2015, Dr. Rhodes completed a questionnaire outlining her diagnosis of generalized anxiety disorder and PTSD as pertaining to claimant. She opined that those

- 4 -

conditions were proximately related to claimant's employment as a firefighter paramedic and that there was a direct causal connection between the conditions under which he worked in that role and his PTSD diagnosis. She further opined that his PTSD did not arise from exposures outside of his employment. Dr. Rhodes also agreed with Widgeon-Hammonds' opinion regarding the causation of claimant's PTSD.

During a deposition, Dr. Rhodes testified that she and Widgeon-Hammonds were part of the same medical practice and that they typically coordinated patient treatment. She stated that her diagnosis of PTSD was based upon the specific on-the-job traumas experienced by claimant and related to her by Widgeon-Hammonds.

Proceedings in the Commission

On October 13, 2015, claimant filed a request for benefits, seeking lifetime medical benefits and temporary total disability.

On July 1, 2016, the deputy commissioner found, based upon the opinions of Widgeon-Hammonds and Dr. Rhodes, that claimant did suffer from PTSD. However, the deputy commissioner found that claimant failed to prove that his PTSD was compensable as an occupational disease under Code § 65.2-400(A) or as an ordinary disease of life under Code § 65.2-401. The deputy commissioner found that the medical providers' diagnosis of PTSD was "based on work-related exposure to traumatic events as well as exposure to traumatic events outside of his employment, including his service providing post-Hurricane Katrina relief." Thus, claimant failed to prove that his condition did not result from causes outside of his employment.

On review, the full Commission reversed the decision of the deputy commissioner. The Commission found that claimant's PTSD is an occupational disease because, while claimant had experienced other personal traumas, his medical providers opined that these did not cause his PTSD. Rather, the Commission found that his providers

- 5 -

clearly pointed to the traumatic events he experienced during his eighteen-year career as a firefighter paramedic, a career that included two trips to participate in Hurricane Katrina relief. We note that but for the claimant's training as a paramedic, he would not have been called to serve in that rescue effort, and the traumas he experienced there were "intimately related to his service-connected activities." [Fairfax Cty. Fire & Rescue Dep't v. Mottram, 263 Va. 365, 375, 559 S.E.2d 698, 703 (2002).] Moreover, Ms. Widgeon-Hammonds' notes and testimony reference numerous specific work-related events, all of which occurred in the course of the claimant's work as a firefighter paramedic, and all of which contributed to his diagnosis of PTSD. Both Ms. Widgeon-Hammond and Dr. Rhodes opined that PTSD is a natural risk of employment of a firefighter and paramedic. Thus, the nature of the claimant's occupation and the relationship between that occupation and the specific disease is clear.

For those reasons, the Commission found that claimant met his burden of proving that his PTSD is an occupational disease. Employer appeals this decision.

## II. ANALYSIS

On appeal, employer argues that the Commission erred in finding that claimant's PTSD is a compensable occupational disease.

"On appeal, factual findings of the [C]ommission will not be disturbed if based on credible evidence." Anthony v. Fairfax Cty. Dep't of Family Servs., 36 Va. App. 98, 103, 548 S.E.2d 273, 275 (2001). "Causation is a factual determination to be made by the [C]ommission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine." Id. at 103, 548 S.E.2d at 276.

Under the Virginia Workers' Compensation Act ("the Act"), Code §§ 65.2-100 to -1310, "a claimant must prove by a preponderance of the evidence either an 'injury by accident' or an 'occupational disease.'" A New Leaf, Inc. v. Webb, 257 Va. 190, 195, 511 S.E.2d 102, 104 (1999). The Virginia Supreme Court has previously held that PTSD can be a compensable disease within the purview of the Act. See Mottram, 263 Va. at 373-74, 559 S.E.2d at 702. However, "[f]or it to be compensable, [a claimant] must show either that PTSD is an

occupational disease under the provisions of Code § 65.2-400 or that it is an ordinary disease of life that may be treated as an occupational disease pursuant to Code § 65.2-401." Id.

Code § 65.2-400(A) provides that an "occupational disease" is "a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment." Code § 65.2-400(B) provides six factors necessary to establish a causal connection between a disease and a claimant's employment:

> A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
>
> 1. A direct causal connection between the conditions under which work is performed and the occupational disease;
>
> 2. It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;
>
> 3. It can be fairly traced to the employment as the proximate cause;
>
> 4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;
>
> 5. It is incidental to the character of the business and not independent of the relation of employer and employee; and
>
> 6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

Employer contends that the record clearly established that claimant's PTSD is not an occupational disease, but rather a non-compensable ordinary disease of life because claimant had substantial exposure to traumatic events outside of his employment.

In support of this argument, employer contends that claimant's PTSD is not an occupational disease because of the numerous non-work-related stressors reported by claimant. Employer contends that these outside stressors—including traumas in claimant's family life and

- 7 -

childhood—demonstrated his substantial exposure to traumatic events outside of his employment. We are not persuaded by employer's assertion. While claimant did describe some past family traumas to Widgeon-Hammonds, she specifically opined that work-related experiences caused claimant's PTSD, not family or any other non-work-related issues. Dr. Rhodes also opined that claimant's PTSD did not arise from traumas outside of his employment. "[T]he fact that there is contrary evidence in the record is of no consequence [i]f there is credible evidence to support the [C]ommission's finding." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). The expert opinions of Widgeon-Hammonds and Dr. Rhodes constitute credible evidence permitting a rational fact finder to conclude that claimant's PTSD was a result of work-related stressors, and the Commission in its role as fact finder did not err in doing so.[3]

Employer further contends that the Commission erred in determining that claimant's work in post-Hurricane Katrina relief efforts supported the finding that his PTSD is an occupational disease because the evidence demonstrated that claimant was not working for employer during those relief efforts. It is clear from its decision that the Commission, in finding

---

[3] Employer also argues that Dr. Rhodes' opinion that claimant's PTSD was work-related should be given no weight because it is based upon a faulty premise. This is so, employer contends, because Rhodes did not have a full and complete history of claimant's stressors, and instead relied upon Widgeon-Hammonds' information. We again find no merit in this argument. We recognize that "[w]henever a physician's diagnosis flows from an assumption that rests upon a faulty premise, such as misinformation provided by a claimant, the commission may refuse, and often will be required to refuse, to attribute any weight to that opinion." Sneed v. Morengo, Inc., 19 Va. App. 199, 205, 450 S.E.2d 167, 171 (1994). However, here, there is no evidence that Dr. Rhodes had any misinformation about claimant's medical history. To the contrary, Dr. Rhodes testified that she regularly consulted with Widgeon-Hammonds on patients in their practice, and did so in claimant's case. Widgeon-Hammonds relayed to Dr. Rhodes the traumas reported to her by claimant, and Dr. Rhodes utilized this information in her diagnosis of claimant. As Dr. Rhodes' opinion was not based on a faulty premise, the Commission, as fact-finder, was free to determine what weight to accord her diagnosis. "Medical evidence is not necessarily conclusive, but is subject to the [C]ommission's consideration and weighing." Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 215 (1991).

that claimant's PTSD is an occupational disease, considered both the traumas claimant experienced during his career as a firefighter for employer *and* those he experienced during his relief work. Thus, the question is whether claimant's trauma experienced post-Hurricane Katrina was "exposure outside of the employment" under Code § 65.2-400(B). We find that the answer to this query is controlled by the definition of "employment" under the statute provided by the Virginia Supreme Court in Pocahontas Fuel Co. v. Godbey, 192 Va. 845, 66 S.E.2d 859 (1951).

In Godbey, claimant had worked continuously in coal mines for thirty-three years, laboring for various employers until he became partially disabled while working for employer. Id. at 847, 66 S.E.2d at 861. At that point, claimant discovered that he had silicosis, a disease with a progression known to be "imperceptible, insidious and slow." Id. at 849-50, 66 S.E.2d at 862. Employer argued that claimant's occupational disease did not arise out of and in the course of his employment, as required, because the evidence did not show that he was "injuriously exposed to the hazards of the disease" while working for employer. Id. at 847, 66 S.E.2d at 861. In affirming the Commission's decision that claimant suffered from an occupational disease, the Court examined the predecessor statute to Code § 65.2-400, former Code § 65.1-46.[4] Id. at

---

[4] Former Code § 65.1-46 provided:

> As used in this Act, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of the employment. No ordinary disease of life to which the general public is exposed outside of the employment shall be compensable, except when it follows as an incident of occupational disease as defined in this law. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
> (1) a direct causal connection between the conditions under which work is performed and the occupational disease,
> (2) it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,
> (3) it can be fairly traced to the employment as the proximate cause,

- 9 -

850-51, 66 S.E.2d at 863.  Regarding the predecessor statute's definition of the word

"employment," the Court stated that

> [w]e think the word "employment" as used in this section was
> correctly defined and properly applied to the facts of this case.  In
> the majority opinion of the Commission it is said:  The word
> "employment" as used in the foregoing statute is not used as it is
> elsewhere in the Act to describe the relation between employer and
> employee.  In this statute the word refers to the work or process in
> which the employee has been engaged and not to his contract with
> an employer to engage in it.

Id. at 852, 66 S.E.2d at 864.

Thus, under Godbey, in determining whether a claimant was engaged in "employment"

under Code § 65.2-400(A), we must look to whether claimant was performing the "work or

process in which the employee has been engaged," not simply to the "contract with an employer

to engage in it." [5]  Here, the Commission made the determination that claimant would not have

---

> (4)  it does not come from a hazard to which workmen would have
> been equally exposed outside of the employment,
> (5)  it is incidental to the character of the business and not
> independent of the relation of employer and employee, and
> (6)  it must appear to have had its origin in a risk connected with
> the employment and to have flowed from that source as a natural
> consequent, though it need not have been foreseen or expected
> before its contraction.

Code § 65.2-400 retained the substance of the former statute, adding a new provision
providing that hearing loss and carpal tunnel syndrome are not occupational diseases but are
ordinary diseases of life as defined by Code § 65.2-401.  1997 Va. Acts chs. 15, 405.

[5] We acknowledge that the Act defines the term "employee" as "[e]very person, including
aliens and minors, in the service of another under any contract of hire or apprenticeship, written
or implied."  Code § 65.2-101.  "A 'contract of hire' is usually defined as an agreement [written
or implied] in which an employee provides labor or personal services to an employer for wages
or remuneration or other thing of value supplied by the employer."  Charlottesville Music Center,
Inc. v. McCray, 215 Va. 31, 35, 205 S.E.2d 674, 677 (1974).  Generally, we examine whether an
employee-employer relationship exists to determine whether an injury or disease is compensable
under the Act.  See Code § 65.2-101.  Here, this relationship is not contested—claimant was
under a contract of hire by employer.  In this case, the question is whether claimant's
post-Katrina relief efforts qualify as part of his "employment" under the definition of that term as
provided by the Supreme Court in Godbey.

assisted with post-Hurricane Katrina relief efforts "but for" his training as a paramedic, and also that the traumas he experienced there were related to his firefighter paramedic work. However, the Commission did not make the specific determination that his service post-Hurricane Katrina was "the work or process" that he had "been engaged" in, namely, labor as a firefighter paramedic. We conclude that a factual finding on this issue is necessary for this Court to determine whether the Commission erred in considering claimant's post-Katrina traumas as support for the finding that his PTSD is an occupational disease under Code § 65.2-400.[6] Therefore, as the Commission did not determine whether claimant's post-Katrina relief effort was the same "work or process" of a firefighter paramedic, we reverse the Commission's ruling and remand for further fact-finding consistent with this opinion.

### III. CONCLUSION

For these reasons, we reverse the Commission's decision and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

---

[6] We remand for the Commission to make this factual finding because we cannot determine, based upon this record, that claimant's PTSD is an occupational disease as a matter of law. Cf. Mottram, 263 Va. at 375, 559 S.E.2d at 703 (concluding that claimant's PTSD was an occupational disease under Code § 65.2-400 as a matter of law on appeal when there was no evidence in the record that claimant was exposed to traumatic events outside his employment).